# Collins *v.* Martin et al., Appellants.

*Constitutional law—Article III, section 18, of the Constitution —Appropriations for charities—Sectarian hospitals—Department of welfare—Act of April 13, 1925.*

1. The purpose of section 18, of article III of the Constitution was to forbid the State from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and education.

2. Such provision represents a right or power expressly withheld by the people, and as such transcends the judicial, legislative and executive authority.

3. It is the duty of the courts to prevent any violation of such provision whether through a direct effort by legislation peacefully to rewrite any part of it, or an indirect way coming through an act of charity of a state created agency.

4. The Commonwealth may appropriate state money for the care and maintenance of indigent, infirm and mentally defective persons, without ability or means to sustain themselves, but such acts of appropriation are voluntary and do not create rights, duties or obligations; there is no right in the beneficiary to the privilege.

5. Such appropriations are always subject to the constitutional prohibition that no money shall be given "to denominational or sectarian institutions, corporations or associations."

6. The State cannot secure performance of a governmental function through a medium that has been prohibited.

7. If the function may be performed in two or more ways, one of which is prohibited, then the performance of the function can not take place in the prohibited way.

8. If the performance of the proposed function can be done only in one way and that way is prohibited by the Constitution, then there can be no function or duty of government relating to the thing to be done.

9. While the department of welfare is an agency of the government and an appropriation may be lawfully made to it to pay for the treatment of the indigent, sick or injured in medical and surgical hospitals not owned by the Commonwealth, it cannot pay any moneys so appropriated to religious or sectarian institutions. If it does so, the Constitution is violated.

10. The mere fact that the hospitals to be selected are left uncertain by the Appropriation Act does not eliminate the constitutional prohibition from the appropriation when the hospitals are

selected; and, this is the case, even though the money the hospitals are to receive, was apparently given to the department.

11. The supervision of the distribution of the State's money to the hospitals selected, and the manner of ascertaining the amount due, effect a change of method only; there is no change in the character of payment; it is still designed to go to a sectarian institution for charitable purposes.

12. The constitutional prohibition cannot be avoided by saying that what the State does is merely to buy from sectarian institutions "hospital service," as it would buy a commodity.

13. The acceptance of the appropriation enables the institution to furnish the service and as a sectarian institution, to function, to that extent.

14. It is immaterial whether the sectarian institution receiving the money is to be benefited or profited, or whether such money merely replaces what is actually used in caring for patients.

*Appeals—Equity—Findings of fact—Sectarian institutions.*

15. A finding of fact by a chancellor on sufficient evidence, that a hospital is a sectarian institution, has the effect of a verdict of a jury, and will not be reversed on appeal in the absence of manifest error.

Argued January 10, 1927. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

Appeals, Nos. 9 and 10, May T., 1927, by Edward Martin, Auditor General et al., and Sisters of St. Francis of Philadelphia, from decree of C. P. Dauphin Co., Equity Docket 1925, No. 802, Commonwealth Docket 1925, No. 141, granting injunction in case of Willis Collins v. Edward Martin, Auditor General, Samuel S. Lewis, State Treasurer and the Sisters of St. Francis of Philadelphia. Affirmed.

Bill for injunction. Before Wickersham, P. J.

The opinion of the Supreme Court states the facts.

Decree for plaintiff. Defendants appealed.

*Error assigned,* inter alia, was decree, quoting record.

*Wm. A. Schnader,* Special Deputy Attorney General, with him *George W. Woodruff,* Attorney General, for Commonwealth.—Under the Act of April 13, 1925, the department of welfare was authorized to arrange for the care and treatment of indigent sick and injured persons in hospitals not owned by the Commonwealth: Com. ex rel. v. Gregg, 161 Pa. 582.

The department of welfare having a discretionary right to make arrangements for the treatment of the indigent sick or injured under the Act of 1925, clearly the appropriation made by the act was to the department.

The appropriation made by the Act of April 13, 1925, was not an indirect appropriation to hospitals: Collins v. State Treasurer, 271 Pa. 428.

There is a distinct difference between the relationship existing between the Commonwealth and hospitals receiving appropriations from the legislature and the relationship between the Commonwealth and hospitals under contract with the department of welfare.

An appropriation to enable a branch of the state government to perform a governmental duty is not an appropriation for charitable purposes: Busser v. Snyder, 282 Pa. 440; Fire Ins. Patrol v. Boyd, 120 Pa. 624.

The contract between the department of welfare and St. Agnes Hospital is a valid contract.

It is not unconstitutional for a sectarian institution to receive money, not appropriated to it, to compensate it for services rendered or materials furnished.

This court did not either in Collins v. State Treasurer, 271 Pa. 428 or Busser v. Snyder, 282 Pa. 440, decide the questions involved in this case.

*Francis Shunk Brown,* with him *Daniel C. Donoghue* and *Joseph P. Gaffney,* for appellant, the Sisters of St. Francis of Philadelphia.—The Appropriation Act of April 13, 1925, is constitutional. Under its provisions the department of welfare was authorized to arrange

for the care and treatment of indigent sick and injured persons in hospitals not owned by the Commonwealth. The appropriation was made to the department of welfare, and for the purposes specified in the act it had authority to make a contract with St. Agnes Hospital. The contract which it made is valid.

St. Agnes Hospital is an unincorporated association separate and distinct from the Sisters of St. Francis of Philadelphia, a corporation not affiliated with it and not under its supervision, domination or control. It is not a denominational or sectarian institution, corporation or assocation as comprehended by section 18 of article III of the Constitution of Pennsylvania.

*J. Siegmund Levin,* for appellee, Willis Collins.—The Act of April 13, 1925, did not vest in the department of welfare a discretionary power to contract with hospitals for the treatment of indigent sick and injured.

The department of welfare has no discretionary power under the Act of 1925.

The appropriation made under the Act of April 13, 1925, was an indirect appropriation to hospitals. There is no difference in the relations existing between the Commonwealth and hospitals receiving direct appropriations and those between the Commonwealth and the contract hospitals. The contract between the department of welfare and St. Agnes Hospital is immaterial to the discussion.

The act appropriates money to a number of hospitals, not to the department of welfare.

The act delegates to the department of welfare the power to determine what hospitals shall receive the money appropriated, and to determine (subject only to a maximum limitation) the amount which each shall receive, which powers are legislative: Hollinger v. King, 282 Pa. 157; O'Neil v. Ins. Co., 166 Pa. 72.

The appropriation made by the Act of April 13, 1925, is for charitable, educational or benevolent purposes.

The Constitution prohibits the appropriation of state money for charitable, educational or benevolent purposes, directly or indirectly, to any sectarian institution, corporation or association. If the money appropriated to the department of welfare is in effect to be paid to a sectarian institution, it can make no difference how the money has been appropriated.

OPINION BY MR. JUSTICE KEPHART, June 25, 1927:

The claim of St. Agnes Hospital for the treatment and maintenance of indigent sick and injured, is based on the Appropriation Act of April 13, 1925; its payment was challenged as being an attempt to violate article III, section 18, of the Constitution, and the fiscal officers of the Commonwealth were restrained from paying. This appeal followed.

The Act of 1925, omitting unnecessary words, reads: "The sum of one million dollars ($1,000,000) . . . . . . is . . . . . . appropriated to the department of welfare to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, . . . . . . payments to be made at the rate of three dollars ($3.00) per diem for the medical and surgical treatment rendered to, and maintenance of, each person treated in said hospitals who is entitled to free service; . . . . . . Provided, however, That no hospital shall receive compensation at a rate exceeding the actual cost of service per capita." Then follows the method of ascertaining the number of indigent sick and injured and the manner of certification of the account for payment.

The Constitution reads: "No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association." It is here contended by appellants, (1) that the care of the indigent sick and injured is a governmental function, and an appropriation to enable the performance of

that function can not be classed as being one for a charitable purpose, even though it be worked out through a sectarian institution; (2) the department of welfare is an agency or an arm of the government and an appropriation may be lawfully made to it to be expended for charitable purposes where the department has a discretionary right under the act to select the hospitals to spend the money, even though such a hospital might be a sectarian or denominational institution, corporation or association; (3) the Constitution does not prohibit a governmental agency from contracting with an interdicted institution, association or corporation for hospital service, though its fundamental basis be charity or benevolence; and (4) the institution was not sectarian.

The contentions overlook the purpose of the constitutional provision as interpreted by this court, and also misconceive much of the effect of the Act of 1925 under which the State officers are attempting to operate. Our interpretation of section 18 of article III in Collins v. State Treasurer, 271 Pa. 428, in an opinion by our present Chief Justice, is unmistakable. The appropriation for charitable purposes in that case was made directly to a sectarian hospital. The appropriation in the present case is for charitable purposes to the department of welfare for non-state owned hospitals, including sectarian hospitals. It is stated in that opinion (p. 433): "The intent of these provisions was......to forbid the State from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and education;......to serve charitable, educational or benevolent purposes the money of the people shall not be put under denominational control or into sectarian hands, for administration or distribution, no matter how worthy the end in view. It will be noted, the Constitution......provides ......that 'no appropriation shall be made to any denominational or sectarian institution.' These words ......plainly forbid state aid to institutions affiliated

with a particular religious sect or denomination, or
which are under the control, domination or governing
influence of any religious sect or denomination."

There should be no doubt as to the comprehensiveness
of this provision in the Constitution. It states in short
(and this is the real thought underlying the constitu-
tional provision) that the people's money shall not be
given for charity, benevolence or education to persons
or communities, or for any purpose to sectarian and de-
nominational institutions, corporations or associations.
This mandate comes direct from the people. It is placed
on those in authority, to be followed without exception
or reservation of any character. It is to be obeyed as a
command. It represents a right or power expressly
withheld by the people and as such it transcends the ju-
dicial, legislative, and executive authority. The pro-
vision forces recognition as a part of our scheme of gov-
ernment; it is a limitation on authority, and, with the
other affirmative powers, forms the basis of our social
organization. It is an exemplar of one of the most fun-
damental concepts of our government. It is then the
imperative duty of judges to hold strictly to the funda-
mental law, and prevent any violation of it whether
through a direct effort by legislation peacefully to re-
write any part of it, or an indirect one coming through
an act of charity of a state-created agency. The claim
is surrounded by the strong appeal which usually ac-
companies charitable acts, and is fortified with actions
expressive of deep human interest. These conceal the
real end that would be accomplished should the courts
fail to enforce the constitutional prohibition. Coiled
within such presentation are those elements which, re-
leased through humanitarian motives, would place this
government in an aspect in direct opposition to the prin-
ciples on which the section was grounded. If we per-
mitted this, our acts would make of the Constitu-
tion a mere waste of words. However meritorious
the purpose for which the organic law is attempted

to be set aside, our duty is to stay the hands of all concerned in its accomplishment. If this constitutional feature is unjust, then an appeal should be made to the people responsible for this negation of power; it does not lie in the courts to alter it.

The Collins Case was decided more than six years ago, and was followed by the Old Age Pension decision (Busser v. State Treasurer, 282 Pa. 440). Ample time has since elapsed to have appealed to the legislature for a change, and from it to the people. No effort was made to do so except as to the Old Age Pension. Instead, we have this Act of 1925, and for what purpose? Its intent as it relates to the effect of the Collins Case is plainly manifest. To uphold the claim here presented, we would be compelled, in all fairness, to reverse the Old Age Pension and the Collins decision. We can not do so.

On the first proposition: Has the State undertaken the care of the indigent sick and injured as a governmental function or duty? The attitude and practice of the State under the present Constitution is submitted in support of this position. The first legislature in 1876 appropriated $5,000 to but one hospital, and the number and amount has gradually increased until in 1925 approximately $5,000,000 has been appropriated to over 200 hospitals, all for the same charitable purpose. The State's benefactions in relief of the indigent deaf, dumb, blind, insane, and tubercular, add approximately $5,-000,000 or $6,000,000 more. While such activities may, because of their number and importance to the recipients, assume the form of a governmental function or duty, of which we shall speak later, they do not lose their chief character, viz, the State's work of charity. As a sovereign, the State may be generous, considerate, or just to a part of its subjects and give money with or without adequate equivalent in return, as, for illustration, the relief of the indigent in case of sickness or injury, or as a bounty, reward, pension or payment for

public services formerly rendered but not fully requited in yearly wage.  Many other illustrations might be given; the money paid may be due from the State as recompense for past services either in civil or military life, or it may be given for charity or benevolence.  From the viewpoint of abstract justice, all such activities may be termed a governmental duty; but even so they do not lose the compelling characteristic that attaches and causes State recognition.

The test of whether a particular governmental activity may rightly be called a duty or an obligatory function of government is whether the welfare of the State as a whole is substantially promoted by or involved in its exercise.  That such a result is achieved by such activity only casually or incidentally, or as an act of convenience, is not sufficient.  Does the State have a primary interest in the performance of the thing?  All state activities are more or less of a governmental nature, and while matters of public health generally may be assumed to be a governmental duty, the health of an individual, or a number of individuals, as contemplated by the Appropriation Act now under consideration, and the various other similar acts, affect the mass of the people only remotely or to a minute degree.  Such an activity is not within the class that may be called an obligatory duty or function.  Even assuming that it be so where educational, charitable or benevolent purposes ground the gift, the constitutional provision must be considered.

In support of the theory that an appropriation to carry on a governmental duty, the relief of indigent sick, is not one for a charitable purpose, what we said in Busser v. State Treasurer, 282 Pa. 440, 453, is cited.  We stated: "There is no direct prohibition against the use of state money to pay for the care and maintenance of indigent, infirm and mentally defective persons, without ability or means to sustain themselves, and other charges of a like nature.  They became direct charges on the body politic for its own preservation and protection.

As such, in the light of an expense, they stand exactly in the same position as the preservation of law and order. To provide institutions, or to compensate such institutions for the care and maintenance of this class of persons, has for a long time been recognized as a governmental duty, and where institutions are compensated (except as hereinafter noted) for the care of indigent, infirm and mentally defective, including certain physically defective, persons, such appropriations may well be sustained on this theory." It is argued that the effect of this decision should be applied to the care of the needy poor contemplated by the Act of 1925, and the various direct appropriations to hospitals. But the difference between the two classes is manifest; it lies in the words "without ability or means to sustain themselves." On the one hand there are persons totally indigent, as opposed to persons being generally able to take care of themselves, yet when sickness or injury overtakes them they are unable to provide proper treatment, and as to that they are indigent.

This activity of the State, however, is a discretionary duty. In Scibilia v. Phila., 279 Pa. 549, 553, the Chief Justice describes these activities as being "governmental," "public," "legislative" or "discretionary," and further as being "proprietary," "ministerial," "corporate," or "municipal." As the State provides for only eighty per cent of the total of this class of needy people, twenty per cent must look to the public generally to supply this particular charity. The government shares with the public the performance of this charitable work. It might do so on an equal basis or the above proportions might be reversed. Discretionary acts are those of grace; they do not create rights, duties, or obligations. They are merely privileges accorded, here, because of the condition of life of those receiving aid; there is no right in the beneficiary to the privilege. It cannot be denied that the State may, if it chooses, shut off all such relief without the slightest injury to the government or

the great mass of its people.  This illustrates most forcibly the discretion in performing the charitable acts.

Whether the charitable work is compulsory or discretionary, the performance is controlled by the Constitution.  No function of government can be discharged in disregard of or in opposition to the fundamental law. If the performance of the proposed function can be done only in one way and that way is prohibited by the Constitution, then there can be no function or duty of government relating to the thing to be done.  If the function may be performed in two or more ways, one of which is prohibited, then the performance of the function or duty can not take place in such prohibited way. Overshadowing any proposed exertion of power, there is always the limitation of the Constitution; in this case no money shall be given "to denominational or sectarian institutions, corporations or associations."  It stands as a sentinel in its limited sphere to warn and prevent those in control who may attempt to invade the forbidden ground and when attention is directed to their conduct, the Constitution articulates through the courts.  The State cannot secure performance of a governmental duty through a medium that has been prohibited from acting.

As to the second proposition: it is true the department of welfare is an agency of government and not a sectarian or denominational institution; though, if the State's contention be correct, it might easily become one. It is urged that there is lodged in it power to secure any non-state owned hospital it chooses, regardless of article III, section 18, to execute the purpose expressed in the Act of 1925, and the department alone controls the expenditure of the money appropriated.  This is a unique presentation, but where does it lead us?  Imagine the appropriation of millions to a state-created agency to be spent at its discretion in defiance of the Constitution! For illustration, suppose an appropriation of millions to the department of education to be used for educational purposes, as is now the case, and that department

could contract with sectarian institutions for the education of our youth in such institutions, instead of providing this education through the means of the public schools. The grip that could be thus laid on state finances would soon become a matter of church polity, wherein all efforts directed against church control, so much feared by the framers of the Constitution, would be paralyzed. The mere statement of the possibilities that follow in the wake of such construction should be sufficient answer to this contention. Observe further as the present case, under the Commonwealth's contention, demonstrates. The act has placed in the hands of one person the sum of one million dollars ($1,000,000) with unlimited power to distribute it among nonstate owned hospitals for the treatment and maintenance of the indigent sick, or, in other words, for charitable purposes. The individual at the head of this department could select only hospitals of the faith of appellant, and after the accommodations of such hospitals became adjusted to continue the work, a new officer might be appointed, who, through prejudice, bigotry or other cause, would select non-state owned hospitals of other faiths, or of no particular faith, and deny to those of appellant's faith any right to participate in the fund appropriated. Can it be doubted for a moment that a circumstance of like nature was one of the reasons which caused the framers of the Constitution to place therein the section now under discussion?

The government may lawfully appropriate to a department, a sum of money to be expended for a designated purpose, and such expenditure may involve discretionary acts. This appropriation was to the department of welfare; the money was to be paid out for a specific purpose and to designated agencies. We do not consider the question of its discretionary right to select one of the many non-state owned hospitals as the medium to work out the legislative purpose as important, nor do we so consider the question of control of expenditures.

Both rights are seriously questioned here. The mere fact that the hospital to be selected is left uncertain by the act does not eliminate the constitutional prohibition from the appropriation when it is selected, even though the money it is to receive was apparently given to the department. It has been designed that the State's money should go to reimburse a sectarian institution for the "treatment and maintenance of the indigent sick and injured" in medical and surgical hospitals not owned by the Commonwealth. The right of selection is not written in the act, but admitting it, the appropriation is in reality not to the department but to non-state owned hospitals generally; this class includes, though not specifically named, sectarian and denominational institutions. The moment one is selected, such selection has the effect of writing into the act the hospital thus chosen to the same effect as though an appropriation had been made to it direct.

On the subject of control, the supervision of the distribution of the State's money to the hospitals selected, and the manner of ascertaining the amount due, effect a change of method only; there is no change in the character of payment; it is still designed to go to a sectarian institution for charitable purposes. The change by the legislature as to what must appear before funds appropriated may reach an intended hospital, whether on account of a deficit, or, since the Act of 1923, in payment of an operating charge based on a per diem charge, is merely a change of administrative work having no effect whatever on the underlying purpose. The change was brought about to encourage the more economical operation of hospitals; the State still pays for "hospital service," which, in this connection, is a matter of charity. The same thought exists as to an observance by the hospital of the rules and standards for so-called service in treatment and maintenance. The right to make these rules is also disputed. Under the new method and the rules, better treatment is secured, or at least the treat-

ment and maintenance is regulated; manipulation of the books is prevented; all of which aids in ascertaining what is justly due for the care of charitable patients. Neither the plan adopted for ascertaining the amount to be paid, nor the rules for treatment and maintenance, change the cause or purpose of payment. This is the case whether the money is paid through an agency, or is an appropriation direct to hospitals under the Act of 1923, acts prior to, since, or under the administrative code; all are underwritten by the State's charitable purposes, and neither rules nor standards so created will serve to obscure the constitutional provision applicable to such disbursements.

What is really done by the State as it relates to the control of expenditures is that the State reimburses the hospital for the money used by the hospital in caring for the indigent sick. The real control and spending agency is exclusively in the hospital and the act intended that it should be so. The money which the State gives does not go into the hands of the indigent sick and injured, nor their doctors; it rests with the department only long enough to be taken out by the hospital in the method provided by the act. Whether the department, under the Act of 1925 or the Administrative Code, possesses the power to fix standards so as to work out a certain amount of control is immaterial and we are not called on to decide that question at this time.

On the third contention, may the department contract with any hospital within the class for "hospital service," and buy that service like, for instance, the purchase of a bag of flour? The term is one invented by the officers of the government and by it the state officials hope to bridge the gap of unconstitutionality. Contract with a non-state owned hospital, and for what? The State's money, by the act, is appropriated "for the treatment and maintenance of the indigent sick and injured" to relieve those who are too poor to pay the expenses necessary for treatment. The State does not undertake in

any capacity to do the actual work; the State does not manage, conduct, take over or interfere with the internal or external affairs of the institution. The management is as it has always been, in private hands. It is not similar to the work done at institutions that are state owned. What the State through its act in effect says to non-state owned hospitals is, "For such of these unfortunates whom you minister to, I will reimburse you for treatment and maintenance." But accept the contract and the "term" and the thing that is done is none the less an act of charity moving from the State, though it may be called "hospital service," treatment and maintenance, so many pills or so many meals. Nor is the thing accomplished any the less the State's charity because it is worked out through the medium of a hospital, nor is the institution any the less sectarian because it, as a non-state hospital, receives through a department part of an appropriation to recompense it for money expended for the State's charitable purpose. The Constitution prohibits contracts with sectarian or denominational institutions, associations and corporations, where the basic subject-matter is founded on an appropriation for charity and benevolence. Such conclusion may or may not prevent contracts with such institutions on other grounds or for other purposes where charity and benevolence is not the controlling purpose, yet may be remotely and indirectly concerned, where the contract is for the purchase of a specific thing, or a given commodity. All such questions are beside the point now under consideration and many reasons may suggest themselves, differentiating such suggested cases from the one before us.

Even if it be conceded that the arrangement entered into between the department and the hospital represents the purchase of a commodity, the all-important fact still remains that, by virtue of that very arrangement, and payment under the Act of 1925, the sectarian institution is enabled to furnish the commodity,—care

of the indigent sick,—and it is thereby enabled to do it as a sectarian institution; it still exists as such and even though no profit be made, or though the compensation covers only the cost, or less, the institution is thereby, to that extent, enabled to function as a sectarian institution, and on the people's money.

As stated in the Busser Case, supra, "The intent and purposes of these provisions was and therefore still is, to forbid the State from giving, *either directly or indirectly* ......*appropriations to liquidate these expenses (for charitable and benevolent purposes)*......*through a department or agency,* to denominational or sectarian institutions." Appellants urge that the Collins Case, in this respect, is not applicable. As we view it, it has a peculiar force when applied to the facts here presented. Neither the individuals on the one hand, nor the legislature on the other, can set up a fictitious body to conceal the real purpose of the appropriation.

The Appropriation Act gives no right to purchase "service." The act plainly states that the appropriation is to pay for the "treatment and maintenance of the indigent sick and injured" and the use of the term "hospital service" and the thought of service being purchased, will not serve to take away the constitutional inhibition. The term "hospital service" rises no higher, nor does it include within it elements which do not go hand in hand with the performance of any charitable work, nor does it import any more sanctity than did the underlying purpose attached to direct appropriations to such institutions considered in the Collins Case, prior to the Act of 1923, nor such appropriations under that act nor since its passage. The making of a contract by the department, whether authorized or not, can not aid an unconstitutional act.

The learned counsel for appellants urge with much force that Saint Agnes' Hospital is not a sectarian institution. Counsel need not be reminded of the rule, so frequently expressed, that the findings of fact of a chan-

cellor, supported by competent evidence, or drawn by inferences from such evidence, has the effect of a verdict of a jury: Glenn v. Trees, 276 Pa. 165, 167; Miller v. Central Trust & Savings Co., 285 Pa. 472, 476. Under this rule, after carefully considering the evidence, we must sustain the findings of the chancellor. It would serve no useful purpose to discuss the separate findings in detail.

In conclusion we may say that it is immaterial whether the institution receiving the money is to be benefited or profited, or whether in fact such money merely replaces what is actually used in caring for this class of citizens.

After a careful consideration, the assignments of error are overruled and the decree of the court below is affirmed, at the cost of appellants.