## Appropriation for Unemployment Relief.

SCHNADER, Attorney General, October 27, 1931.—You have asked to be advised what measures the Legislature of Pennsylvania may take under our Constitution to relieve the distress resulting from unemployment during the forthcoming winter. Specifically, you wish to know:

First: Whether the legislature can make appropriations for the payment of money or the furnishing of food, clothing and shelter to unemployed persons and their families;

Second: Whether the legislature can make an appropriation to a state agency for these purposes;

Third: Whether the legislature can appropriate money to political subdivisions of the state for these purposes; and,

Fourth: Whether the legislature can make appropriations to incorporated or unincorporated welfare agencies, the money to be used for these purposes.

The constitutional provision which immediately comes to mind in considering the legislature's ability to appropriate money for unemployment relief is article III, section 18, which reads as follows:

"No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association."

In Busser et al. *v.* Snyder, 282 Pa. 440 (1925), the Supreme Court held that this section had been violated in the passage of the "Old Age Pension Act" of May 10, 1923, P. L. 189.

The act created an Old Age Assistance Commission and county old age assistance boards which were to administer its provisions. It provided that assistance might be granted only to persons seventy years of age or upwards who had been residents of the United States and of this Commonwealth for certain periods prior to their application for aid, who had no children or other persons responsible for their support and able to support them, who had property of the value of less than $3000, and who had an income of less than $1 per day. The amount of assistance was to be such that when added to the income of the applicant from all other sources it would not exceed a total of $1 a day.

In attempting to sustain the act, the Attorney General sought to have the court take the view that the words "person" and "community" as used in article III, section 18, of the Constitution have a restricted meaning. He argued that, in view of the fact that old age assistance was to be granted by an administrative agency and that money for assistance had been and was to be appropriated to this agency, the constitutional provision was not applicable. In disposing of this argument, Mr. Justice Kephart said, at page 451:

". . . This contention is not sound; 'person' and 'community' are not limited to the idea of a single person or place where persons are located; they are used in an inclusive sense, relating to an individual or a group or class of persons, wherever situated, in any part or all of the Commonwealth. It applies to persons, kind, class and place, without qualification. The language of the Constitution is an absolute and general prohibition. Nor does the fact that the appropriation is made to an agency (the intermediate and practical step by which public money is distributed to citizens) aid appellant's case. The gift is not to the commission, but to the particular persons selected by the legislature to receive it. The commission cannot use the money; it merely passes it on to the selected class. It is none the less a gift directly to the individual, even though it pauses for a moment on its way thither in the hands of the agency. Nor can the act be sustained because the appropriation is to an agency as an arm of the government, working out a governmental policy. What the Constitution prohibits is the establishment of any such policy which causes an appropriation of state moneys for benevolent purposes to a particular class of its citizens, whether under the guise of an agency, as an arm of the government through which a system is created, or directly to the individual. . . ."

The Attorney General also argued that if the Old Age Pension Act were held unconstitutional, by the same reasoning grants of public money for the care and maintenance of indigent, infirm and mentally deficient persons without ability or means to sustain themselves must be stricken down as unconstitutional. Answering this proposition, Mr. Justice Kephart said, at page 453:

". . . To provide institutions, or to compensate such institutions for the care and maintenance of this class of persons, has for a long time been recognized as a governmental duty, and where institutions are compensated (except as hereinafter noted) for the care of indigent, infirm and mentally defective, including certain physically defective, persons, such appropriations may well be sustained on this theory. The expenditure of money for such purposes is and long has been recognized as a function of government, and the manner of its administration is restricted only by section 18 of article III, . . ."

It was also argued that if this act were held void, the various state retiremen acts must also fall. This the court said was not sound because the retirement acts do not appropriate money for charitable or benevolent purposes. They provide compensation for the hazard of long-continued public employment.

Finally, the Attorney General sought to sustain the act on the ground that it was a "poor law" and that there is no constitutional inhibition against state aid for poor relief. This contention was discussed at length. At page 457, Justice Kephart said:

"As said by Mr. Justice Brewer in Griffith v. Osawkee Twp., 14 Kans. 418, 422, 27 Pac. St. Rep. 322, 324, 'Cold and harsh as the statement may seem, it is nevertheless true that the obligation of the state to help is limited to those who are unable to help themselves.' We agree with what the court below says on this question: 'That system provided for poor districts, poor directors and overseers, and for the relief of paupers is a matter of local concern. Those who framed the Constitution understood it, and no word is contained in the Constitution with reference to it. The system was left untouched. If there had been any purpose to change that system, some word indicating that purpose would have been found in the Constitution. . . . The conclusion is therefore irresistible that a direct appropriation from the state treasury to any person or class of persons cannot be sustained on the theory that it is a discharge of the inherent obligation of the State to take care of its paupers.' "

This decision necessarily leads us to the conclusion that an appropriation enabling cash, food, clothing or shelter to be supplied to those who are unemployed because of economic depression would be treated as a charitable appropriation to "persons" and, therefore, unconstitutional. Clearly, if a person is an object of charity when unable to support himself by reason of advanced age and lack of sufficient income, then a person is likewise an object of charity when unable to support himself because of temporary unemployment due to economic depression.

Another Supreme Court decision which requires consideration is Collins v. Martin et al., 290 Pa. 388 (1927).

The legislature had appropriated a million dollars to the Department of Welfare for the care and treatment of indigent sick and injured persons in hospitals not owned by the Commonwealth. The department contracted with certain hospitals to furnish medical and surgical treatment to such persons at a per diem rate. One of these hospitals was St. Agnes Hospital in Philadelphia, which the court found to be a sectarian institution. The question was whether the State Treasurer could lawfully pay to St. Agnes Hospital the amount which the Department of Welfare had contracted to pay it for the treatment of indigent persons cared for in the hospital.

The Attorney General argued that the payment could be made because, under the contract, the Department of Welfare was purchasing service for indigent persons and was not giving money to the hospital except as compensation for services rendered; that (as indicated by the Supreme Court in the Old Age Pension Case) the treatment of indigent sick and injured persons is not a charity but a governmental duty; and that it is not unconstitutional for a sectarian institution to receive money not appropriated to it, to compensate it for services rendered or materials furnished.

All of these contentions were rejected by the court, which held that payment could not be made to the hospital under its contract with the Department of Welfare.

Mr. Justice Kephart, speaking for the court, at page 395, disposed of the state's contention that the care of indigent sick and injured persons is not a charity but the performance of a governmental duty. He said:

". . . While such activities may, because of their number and importance to the recipients, assume the form of a governmental function or duty, . . . they do not lose their chief character, viz., the State's work of charity."

The court distinguished between governmental care of the poor, as carried on during the entire history of the state, and the care of persons who are temporarily in need of financial assistance. It had been argued that the language used by Mr. Justice Kephart in the Busser case supported the proposition that any appropriation to care for indigent persons is made in the performance of a governmental duty. This contention was answered, at page 397, as follows:

". . . It is argued that the effect of this decision [the Old Age Pension decision] should be applied to the care of the needy poor contemplated by the Act of 1925, and the various direct appropriations to hospitals. But the difference between the two classes is manifest; it lies in the words 'without ability or means to sustain themselves.' On the one hand there are persons totally indigent, as opposed to persons being generally able to take care of themselves, yet when sickness or injury overtakes them they are unable to provide proper treatment, and as to that they are indigent."

The court took the position that an appropriation to a state department, to be used for paying a sectarian institution for services rendered, is equivalent to an appropriation made directly to the sectarian institution. That being so, an appropriation to a state department for feeding or clothing persons or communities must be regarded as equivalent to an appropriation directly to the persons or communities to be benefited.

Under this decision, an appropriation for unemployment relief made to a department, commission or other agency created by law would be just as objectionable as appropriations made directly to the beneficiaries whom the legislature desires to aid. If it is not a governmental duty but a charity for the state to provide for the care of indigent sick and injured persons, it must necessarily follow that it is not a governmental duty but a charity to care for persons temporarily indigent because of economic depression.

A political subdivision of the Commonwealth, whether it be a county, a city, a borough, a township, or a poor district, must necessarily be regarded as a "community" within the meaning of article III, section 18, of the Constitution as interpreted by the Supreme Court in the Busser case. Therefore, the legislature could not make an appropriation for any charitable purpose to any such political subdivision.

Accordingly, we are compelled to answer your first three questions in the negative. The legislature cannot make appropriations for the payment of money or the furnishing of food, clothing and shelter to unemployed persons and their families either directly or through a state agency or to political subdivisions of the state.

The question remains, could the legislature appropriate money for unemployment relief to a nonsectarian institution, corporation or association?

It is true that the Supreme Court in the Busser case indicated that by forbidding charitable appropriations to be made to denominational or sectarian institutions, corporations or associations, the people in the Constitution had recognized the right of the legislature to make such appropriations to nondenominational or nonsectarian institutions, corporations and associations.

However, in considering the legislature's right to make such appropriations, we cannot ignore the inhibition against appropriations for charitable purposes "to any person or community;" and if an appropriation were made to a nonsectarian corporation for purposes incident to unemployment relief, the effect would be indirectly to aid a person or group of persons by supplying them with money or its equivalent in food, clothing or shelter. This would be no different from a similar appropriation made to a department or com-

mission of the State Government. The real purpose of the appropriation would be to extend financial aid to those who, for lack of employment, must be given assistance.

Let us suppose, for example, that a corporation were formed to administer an old age pension system. Would the Supreme Court sustain an appropriation to such a corporation "for maintenance?" Obviously, it could not, under the reasoning applied in the St. Agnes Hospital case. Consistently with that decision, the court would look through the form of the appropriation and find that it was in fact an appropriation for old age pensions "to persons," and, therefore, invalid.

But, it may be asked, how, then, can maintenance appropriations to hospital corporations be sustained? The answer is clear. These appropriations are made for institutional service; and such appropriations are recognized both in sections 17 and 18 of article III of the Constitution.

We cannot escape the conclusion that, under the cases cited, the legislature could not, without violating the Constitution, make appropriations for unemployment relief to any charitable corporation or association.

From C. P. Addams, Harrisburg, Pa.