## Direct Payments for Nursing Home Care

JOSEPH L. COHEN, Deputy Attorney General, and THOMAS D. MCBRIDE, Attorney General, April 22, 1957.—We are in receipt of your letter in which you request advice as to whether direct payments for nursing home care can lawfully be made to sectarian or denominational nursing homes on behalf of those entitled to receive financial assistance for nursing home care by virture of section 1 the Act of May 15, 1956, P. L. (1955) 1573, which amends section 2 of the Public Assistance Law of June 24, 1937, P. L. 2051, as amended, 62 PS §2502. In that letter you refer to the fact that the Social Security Administration of the Federal Department of Health, Education and Welfare will not consider any nursing home care plan eligible for partial reimbursement from Federal funds unless the payments for such care are made directly to the nursing home and not to the individual receiving nursing home care.

Section 2 of the Act of June 24, 1937, as amended by the Act of May 15, 1956, P. L. 1573, provides as follows:

". . . The word, assistance, shall also be construed to include sufficient financial assistance to enable physically disabled persons who require nursing home care, as prescribed by responsible physicians, to secure adequate nursing home care even though the rate of such assistance may be greater than the usual rate of assistance to persons who do not need nursing home care."

Section 2 of the amendatory Act of 1956, supra, provides as follows:

"The sum of three million dollars ($3,000,000), or as much thereof as may be necessary, is appropriated to the Department of Public Assistance, for the purpose of providing adequate nursing home care, in ac-

cordance with the provisions of the act to which this is an amendment, from March 1, 1956."

The legality of direct payments for nursing home care to sectarian nursing homes involves the provisions of article III, sec. 18, of the Constitution of Pennsylvania which provide as follows:

"No appropriations shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association: . . ."

Since there is no question but that grants made to needy individuals pursuant to the Public Assistance Law of June 24, 1937, P. L. 2051, as amended, 62 PS §2501 et seq., are an exercise of a governmental function, the only pertinent inquiry is whether payments on behalf of individuals eligible to receive financial assistance for nursing home care made to sectarian or denominational nursing homes contravenes article III, sec. 18, of the Constitution.

This section of our Constitution has been considered by the Supreme Court on various occasions: Collins v. Kephart, 271 Pa. 428 (1921); Busser v. Snyder, 282 Pa. 440 (1925); Collins v. Martin, 290 Pa. 388 (1927); Commonwealth ex rel. Schnader v. Liveright, 308 Pa. 35 (1932); Schade v. Allegheny County Institution District, 386 Pa. 507 (1956).

In Collins v. Kephart, supra, the Supreme Court struck down certain appropriations to institutions found to be sectarian. On page 433 of its opinion, the court said:

" . . . The intent of these provisions was, and therefore still is, to forbid the state from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and education; they in effect provide that, to serve charitable, educational or benevolent purposes, *the money of the people shall not be put under denomina-*

*tional control or into sectarian hands, for administration or distribution, no matter how worthy the end in view.*" (Italics supplied.)

Collins v. Martin, supra, extended the doctrine of the Kephart case, supra, to enjoin lump sum payments by the Department of Welfare to sectarian hospitals for the care of indigent sick persons in those hospitals. The court in the Martin case, supra, said, at pages 398-399:

"As to the second proposition: it is true the department of welfare is an agency of government and not a sectarian or denominational institution; though, if the State's contention be correct, it might easily become one. It is urged that there is lodged in it power to secure any non-state owned hospital it chooses, regardless of article III, section 18, to execute the purpose expressed in the Act of 1925, and the department alone controls the expenditure of the money appropriated. This is a unique presentation, but where does it lead us? *Imagine the appropriation of millions to a state-created agency to be spent at its discretion in defiance of the Constitution! For illustration, suppose an appropriation of millions to the department of education be used for educational purposes, as is now the case, and that department could contract with sectarian institutions for the education of our youth in such institutions, instead of providing this education through the means of the public schools. The grip that could be thus laid on state finances would soon become a matter of church polity, wherein all efforts directed against church control, so much feared by the framers of the Constitution, would be paralyzed.* The mere statement of the possibilities that follow in the wake of such construction should be sufficient answer to this contention. Observe further as the present case, under the Commonwealth's contention, demonstrates. The act has placed in the hands of one person the sum of one

million dollars ($1,000,000) with unlimited power to distribute it among nonstate owned hospitals for the treatment and maintenance of the indigent sick, or, in other words, for charitable purposes. The individual at the head of this department could select only hospitals of the faith of appellant, and after the accommodations of such hospitals became adjusted to continue the work, a new officer might be appointed, who, through prejudice, bigotry or other cause, would select non-state owned hospitals of other faiths, or of no particular faith, and deny to those of appellant's faith any right to participate in the fund appropriated. Can it be doubted for a moment that a circumstance of like nature was one of the reasons which caused the framers of the Constitution to place therein the section now under discussion?" (Italics supplied)

In both the Kephart and Martin cases, supra, the court was concerned with the question of lodging in the legislature or an executive department the power of appropriating public moneys to sectarian institutions in contravention of the express prohibition of article III, sec. 18, of the Constitution of Pennsylvania. In both cases the court struck down the appropriation insofar as they were designed to benefit sectarian institutions. The Liveright and Busser cases, supra, although not concerned with appropriations to sectarian institutions, reaffirm the principles laid down in the Kephart and Martin cases, supra.

In the recent case of Schade v. Allegheny County Institution District, supra, the Supreme Court held that payments to sectarian institutions by county institution districts for the care of minor children committed by the juvenile court did not offend article III, sec. 18, of the Constitution of Pennsylvania.

The court said, on pages 511-512 of its opinion in the Schade case, supra:

"We, therefore, choose to bottom our decision on the

ground that payments made by the Institution District for the support and maintenance of neglected or dependent children, who are under the jurisdiction and control of the Juvenile Court, are not appropriations within the meaning of that term as employed in Section 18 of Article III. Indeed, they were not appropriations at all within the most extended scope of the term. This view is so cogently set forth in the concurring opinion [court below] that we cannot do better than quote therefrom as follows: '. . . the plaintiffs have failed to prove any appropriations have, and are being made by [the Institution District] for charitable, educational or benevolent purposes to any denominational or sectarian institutions, or that any public funds are administered through such forbidden channels, or put under their control as an aid to such institutions.

" 'The cost of the maintenance of neglected children either by the State or the County is neither a charity nor a benevolence, but a governmental duty. All the plaintiffs proved was that the monies received by the defendant institutions were in partial reimbursement for the cost of room and board of such minors. The services had been rendered before partial payment on account of same was received. A considerable part of this money is recouped by the Juvenile Court from the parents of those minor wards. The balance of the funds so expended are, in legal effect, payments to the child,—not the institution supporting and maintaining him or her. [See Cochran v. Board of Education, 281 U. S. 370, 374-375] . . .

" 'The Constitution does not prohibit the state or any of its agencies from doing business with denominational or sectarian institutions, nor from paying just debts to them when incurred at its direction or with its approval. Numerous cases can be readily visualized where such situations have occured: i.e. payment of the bill of an injured employee to a sectarian hospital.' "

The Schade case, supra, permits payments made by a governmental body in pursuance of a governmental function on behalf of and for the benefit of specified individuals to sectarian or denominational institutions on the theory that such payments are payments to the individual.

Therefore, this department is of the opinion, and you are accordingly advised, that direct payments to sectarian or denominational nursing homes pursuant to section 2 of the Public Assistance Law, supra, do not offend the Constitution of Pennsylvania and such payments may be made by your department at the request of needy persons applying for financial assistance for nursing home care.