Commonwealth v. City of Philadelphia

*H. S. Levin*, for Commonwealth.

*K. I. Schofield*, for defendant.

KELLEY, J., June 16, 1959.—This declaratory judgment proceeding arises out of a controversy between the Commonwealth of Pennsylvania and the City of Philadelphia and presents the sole question of whether or not a hospital which makes no charge to its patients and which is wholly owned, operated and maintained by the Commonwealth is entitled to receive reduced water rates established by the city for "institutions of purely public charity." Subsequent to the filing of the pleadings, including a motion for judgment which was dismissed, a hearing was held on April 29, 1959. The material facts, as adduced from the pleadings and the hearing, are undisputed.

Petitioner, hereinafter called "Commonwealth," owns, and through its Department of Health, operates and maintains a hospital for tubercular male patients in the City of Philadelphia known as the Henry R. Landis State Hospital, hereinafter called "hospital." The hospital is supported entirely by appropriations from the tax revenues of the Commonwealth. Patients are admitted to the hospital regardless of race or creed and no charges of any kind are made; the treatment is completely free to all patients irrespective of their financial means or ability to pay.

Defendant, hereinafter called "city," supplies the water used by the hospital and under section 5-801 of the Philadelphia Home Rule Charter, the water department establishes the rates to be charged for this service.

Prior to December 20, 1952, reduced water rates for "charitable institutions" were established under section 6 of the Ordinance of December 2, 1916. On December 20, 1952, following a study undertaken by the water department, the city's water commissioner issued water rent regulation no. 3 which established a new schedule of consumer rates. By the terms of this regulation, special low rates are fixed for consumers who qualify as "institutions of purely public charity." Water Commissioner Baxter testified that the department intended by this change of phraseology to require all institutions owned or operated by the Federal, State or local governments to pay regular rates for water. Commissioner Baxter further testified that all or most of the hospitals in Philadelphia, other than those operated by governmental agencies, currently receive the preferential water rate.

Subsequent to the issuance of regulation no. 3, the hospital was billed by the water department at the reduced rate. On December 10, 1956, however, the city's water department informed the hospital, by written notice, that it did not fall within the category of a purely public charity for the reason that the hospital was supported entirely from the tax revenues of the Commonwealth and that under regulation no. 3 only institutions supported entirely or nearly so by voluntary contributions were entitled to be billed at the reduced rate. In order to be assured of its water supply and to prevent further interest and penalties from accumulating, the hospital, without prejudice to its right, paid various water bills submitted by the city for its 1957 minimal consumption and for excess consumption from February 1955 to April 1958, all at a noncharity rate. It is admitted by the city that if the hospital refuses to pay for water supplied to it at the noncharity rate, the hospital's water supply will be shut off.

Initially, it should be observed that the right or power of the city to impose regular water rates upon institutions which are owned and operated by the Federal, State or local governments is not questioned in this proceeding. The Commonwealth contends that the language of the regulation, as adopted by the city, does not exclude institutions of purely public charity merely because they are owned and operated by the Commonwealth and that if the city proposes to deny such institutions the benefit of reduced rates, it must adopt appropriate regulations accomplishing this purpose.

The city argues that because the hospital offers its services to rich and poor alike, without any charge whatever, it loses one of the fundamental characteristics of a charity, namely, that it render help or service solely to those unable to provide themselves with what the institution offers. To sustain this position, the city relies upon the cases of Young Men's Christian Association of Germantown v. Philadelphia, 323 Pa. 401 (1936), and Salvation Army v. Allegheny County, 367 Pa. 373, 380 (1951). We think the city has misconceived the true impact of these decisions. While the general language of these cases tends to support the proposition advanced by the city, it is obvious that such language was intended to be restricted to the particular situations confronting the court and that what was said in those cases must be related to the major problem there being considered. Thus, in the Young Men's Christian Association case, supra, the question before the court was not whether the Y. M. C. A. was a charity; this fact was conceded by all parties even though the beneficiaries of this worthy institution, as expressed in its charter, are not restricted to *needy* young men. What the court did decide was that where a charitable institution uses a portion of its property as a traditionally commercial

enterprise, such as renting out rooms in competition with other lodging houses in the vicinity, that portion of property is liable for the payment of taxes. In the context of determining whether an otherwise *commercial* use of the premises should be construed as a charitable function, the Supreme Court pointed out that one of the factors required was that the institution render "help or services . . . [to] those who are unable to provide themselves with what the institution provides for them . . .": page 412. In the Salvation Army case, supra, the issue was the same as in the Young Men's Christian Association case, although a difference of facts led to an opposite result.

The true test of a purely public charity is that it offers its services or facilities gratuitously or nearly so, that such services or facilities act in relief of the public burden or for the advancement of the public good, that no private or pecuniary return is reserved to the giver or any particular person and that all the benefit from the gift or act goes to the public: Episcopal Academy v. Phila., 150 Pa. 565 (1892) ; West Indies Mission Appeal, 387 Pa. 534 (1957). Thus, an organization having a religious purpose (Episcopal Academy v. Phila., supra), a fire fighting organization acting for the preservation of life and property at fires, without gain or profit to itself (Fire Insurance Patrol v. Boyd, 120 Pa. 624 (1888)), a library open to the public (Donohugh's Appeal, 86 Pa. 306 (1878)), and many others have all been held to be institutions of purely public charity, although no distinction relating to the financial condition of the recipients or beneficiaries of these services was considered. Clearly, the characteristics of the institution under consideration fall within the test as outlined above. Moreover, the opinion in Donohugh's Appeal, supra, cited as recently as 1957 in West Indies Mission Appeal, supra, sets forth in unmistakable language that

an institution solely controlled and administered by the State itself may be classified as a *purely public charity*.

The city rationalizes that because the hospital is supported solely from State tax revenues, and that taxes, unlike contributions, are paid under compulsion, the voluntary character of donation is lacking. In Collins v. Martin, 290 Pa. 388 (1927), appellants therein contended, inter alia, that the care of indigent sick and injured was a governmental function and that an appropriation to enable the performance of that function could not be classed as one for a charitable purpose. The following language of the court, speaking through Mr. Justice Kephart, at page 395, is pertinent:

"While such activities may, because of their number and importance to the recipients, assume the form of a governmental function or duty . . . they do not lose their chief character, viz., the State's work of charity. As a sovereign, the state may be generous, considerate, or just to a part of its subjects and give money with or without adequate equivalent in return . . ."

Next, the city contends that State tubercular sanatoria were not intended by the legislature as institutions of public charity. The city cites section 1 of the Act of May 14, 1907, P. L. 197, as amended by the Act of April 6, 1956, P. L. (1955) 1435, sec. 1, 35 PS §381, which provides: "That one or more sanatoria or colonies be established in the State, for the reception and treatment of persons affected or suspected of being affected with tuberculosis, and removed from their families and people at large to prevent the spread of contagion."

The city theorizes, from the above language, that the purpose of the legislature, in establishing free State tubercular sanatoria, was not to bestow charity upon needy victims or suspected victims of this disease

but rather to protect the general health and welfare of the public at large. To emphasize this rationale, the city pointedly calls attention to the deletion in the Act of 1956, supra, of the words "reception and treatment of *indigent* persons affected with incipient tuberculosis" which appeared in the original Act of 1907, supra. (Italics supplied.) As we observed above, an institution of purely public charity need not restrict its benefits, in the ordinary course of its charitable functions, to persons solely classified as indigent. Furthermore, we need not consider the motives of the donor, i.e., the legislature, in our determination of the question whether or not the institution under consideration is or is not a purely public charity; what is important, in this connection, is the object sought to be attained by the legislation and the purpose to which the State's money is to be applied: Fire Insurance Patrol v. Boyd, supra, at page 646. It seems to us that an object and purpose of this legislation was to provide for the proper care and treatment of tubercular victims. That another object or purpose was to prevent the spread of tuberculosis to the general public by isolating the victims does not detract from the charitable nature of this activity. Nor, in our opinion, can it successfully be contended that the maintenance of a State hospital for the purpose of isolating tuberculosis victims from the general public, is an obligatory duty of the Commonwealth and hence a purely governmental function.

The city next contends that article III, sec. 18, of the Constitution of Pennsylvaina prohibits the appropriation of public moneys for charitable purposes.

Article III, sec. 18, of the Constitution of Pennsylvania, as amended, provides, inter alia:

"No appropriations . . . shall be made for charitable, educational or benevolent purposes, to any person or

community, nor to any denominational or sectarian institution, corporation or association."

The purpose of this section is merely to prevent the establishment of a policy which causes State moneys to be appropriated to a particular denomination or sectarian class of its citizens. The section does not prohibit appropriations to nonsectarian or nondenominational institutions for charitable purposes: Busser v. Snyder, 282 Pa. 440 (1925). See also Collins v. Martin, supra.

Finally, the city contends that the interpretation placed upon regulation no. 3 by the city water commissioner should not be disturbed since the construction of a regulation by those charged with its execution and application is entitled to great weight, the change in phraseology from the Ordinance of 1916 to that in regulation no. 3 was intended by the water commissioner to eliminate all public owned institutions from the charitable rate, section 5-801 of the Home Rule Charter requires the water department to be self-sustaining and the charitable rate represents a loss to the city and the losses represented by the charitable rates must necessarily result in higher rates for the general user.

We fail to see how these contentions aid the city. To allow an interpretation of regulation no. 3 which is clearly at variance with the plain and long established meaning of the language used therein would deprive consumers affected thereby of the right to notice and hearing as required under section 8-407 of the Philadelphia Home Rule Charter. In our opinion, under the language of the regulation as issued, there is no reasonable basis for denying State-owned charitable institutions the benefits allowed to privately owned institutions of the same nature.

For the above reasons, we hold that the Henry R. Landis State Hospital is an institution of purely pub-

lic charity within the meaning of regulation no. 3, that the hospital is entitled to pay for its water supplied by the city at the rates established for institutions of purely public charity and that the hospital is entitled to be reimbursed for all payments made for its water consumption in excess of such charitable rates. The parties are directed to submit an appropriate form of order consistent with this opinion.