# Busser et al. *v.* Snyder et al., Appellants.

*Constitutional law—Appropriations for charities—Constitution, article III, section 18—Act of May 10, 1923, P. L. 189—Poor laws —Old age assistance—Maxims—Expressio unius.*

1. If an act is not opposed to any constitutional barrier, the fact that it may be an excessive regulation of private affairs and therefore socialistic, cannot be considered by the courts in determining its constitutionality.

2. Nor, in the passing upon the constitutionality of such an act, can the courts take into consideration that it may be a highly beneficial measure for the wellbeing of society.

3. An act of the legislature should not be held invalid unless it is clearly, strongly and imperatively prohibited by the Constitution.

4. In passing upon the constitutionality of an act, words must be understood in their general and popular sense.

5. Courts must construe the language of the Constitution literally in the spirit in which it is commonly understood, otherwise prejudices may crop out.

6. The debates of the constitutional convention cannot be taken to override the ordinary meaning of the words employed in the Constitution.

7. The Act of May 10, 1923, P. L. 189, providing for "assistance to certain aged persons" and creating an old-age assistance commission" is unconstitutional, inasmuch as it violates section 18, article III, of the Constitution, which provides that "no appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association."

8. The State is not obliged, either in justice or morals, to perform the duty outlined in such an act.

9. The words "charitable, educational and benevolent" were intended to include pensions or gratuities of any kind, with the exception of those given for military service.

10. Pensions or gratuities for military service are in the nature of compensation for a special and highly honored service to the State, implying the idea of a moral obligation on the part of the government; charity and benevolence are not founded on this consideration.

11. The words "person" and "community" as used in the act, are not limited to the idea of a single person or place where persons are located; they are used in an inclusive sense, applying to persons, kind, class and place without qualification, and so used the language of the Constitution is an absolute and general prohibition.

12. The fact that the appropriation is made, by the Act of 1923, to an agency cannot sustain the act.

13. Nor can it be sustained because the appropriation is to an agency as an arm of the government, working out a governmental policy.

14. Giving to the words "benevolent" and "to any person or community" the broad meaning does not in effect wipe out appropriations to nonsectarian, nondenominational and other institutions or persons.

15. Even if it did, the court would be required to perform its duty in construing the Act of 1923, regardless of the consequences to other appropriations.

16. When the Constitution forbids appropriations to denominational or sectarian institutions, an implied authority was given to appropriate to nonsectarian or nondenominational institutions; expressio unius est exclusio alterius.

17. The appropriation of state moneys for the care of indigent infirm and mentally defective persons, without means or ability to sustain themselves, is a recognized function of government, but this is very different from appropriating moneys to persons able to help themselves who may have an income up to $365 per year or property of the value of $3,000.

18. Appropriation to sectarian or nondenominational institutions to liquidate expenses of the indigent poor cannot be made directly or indirectly, either through a department or an agency created by the government.

19. The state may classify poor persons to a limited extent, but, in doing so, it cannot encroach on the prohibition expressed in section 18 of article III of the Constitution. But the liability to maintain the poor cannot be extended or a new class of poor be created which would be in direct conflict with section 18 of article III.

20. A poor person is one who is destitute and helpless, unable to help himself and without means of support.

21. The retirement acts are not founded on charitable or benevolent considerations, but upon faithful services to the Commonwealth for a long period of years.

22. The Old Age Assistance Act of 1923, cannot be sustained as a poor law.

23. When the Constitution was adopted the terms "poor laws" and "poor persons" were well understood, and the public liability which they involved recognized; but such liability cannot be extended or a new condition created to be brought within it, which would be in direct conflict with section 18, article III, of the Constitution.

Argued November 28, 1924. Appeal, No. 7, May T., 1925, by defendants, from decree of C. P. Dauphin Co., Sitting in Equity, No. 763, Equity Docket, No. 11, Commonwealth Docket, 1924, on bill in equity in case of Clara W. B. Busser et al. v. Charles A. Snyder, Treasurer of the Commonwealth, Samuel S. Lewis, Auditor General, James H. Maurer, Mary V. Grice and David S. Ludlow, Old Age Assistance Commissioners of the Commonwealth of Pennsylvania; and Andrew P. Bower, Old Age Assistance Superintendent of the Common-

wealth.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Affirmed.

Demurrer to bill for injunction.  Before HARGEST, P. J., WICKERSHAM and FOX, JJ.

The opinion of the Supreme Court states the facts.

Demurrer overruled and decree for plaintiffs.  Defendants appealed.

*Error assigned* was, inter alia, decree, quoting it.

*Philip S. Moyer,* Deputy Attorney General, and *Robert J. Sterrett,* with them *George W. Woodruff,* Attorney General, for appellants.—The Old Age Assistance Act does not come within the intent and meaning of section 18, of article III, of the Constitution: Collins v. Kephart, 271 Pa. 428; Com. v. Coal Co., 251 Pa. 134; Com. ex rel. v. Schlager, 18 Lack. Jur. 16.

Mothers' Pension Acts have been sustained as constitutional in the following cases in other states: Denver & Rio Grande R. R. v. Grand County, 170 Pac. (Utah) 74; Re Snyder, 93 Wash. 59; Sterins County v. Klasen, 123 Minn. 382; Cass Co. v. Nixon, 35 N. D. 601; Re Rumsey, 167 N. W. (Neb.) 66.

The state Constitution is one of prohibitions, while the federal Constitution is one of permissions: Sharpless v. Phila., 21 Pa. 147.

The support of paupers and the giving of assistance to those who by reason of age, infirmity or disability are likely to become such, is, by the practice and common consent of civilized communities a public purpose: Cooley on Taxation, 3d ed. 204; Russ v. Com., 210 Pa. 544.

The general rule is that one who claims an act of the legislature to be unconstitutional must prove his case beyond doubt.

The Old Age Assistance Act is not local or special legislation, granting a special privilege to certain corporations, associations and individuals, as contemplated by the prohibition of article III, section 7, of the Constitution: Heidleberg v. Lynn, 5 Whar. 430.

The act does not provide for the use of public moneys for private purposes in violation of section 1 of Amendment 14 of the federal Constituion: State v. Edmondson, 106 N. E. 41.

The act is not a delegation of legislative power to the Old Age Assistance Commission and not in violation of section 1, of article II, of the Constitution: Locke's App., 72 Pa. 491; Com. v. Falk, 59 Pa. Superior Ct. 217; Com. v. Puder, 261 Pa. 129.

*Ira Jewell Williams,* with him *A. Carson Simpson* and *Yale L. Schekter,* for appellees.—The Old Age Assistance Act is contrary to article III, section 18, of the Constitution, which forbids appropriations for charitable or benevolent purposes to any person, community or sectarian institution: Weigold v. R. R., 208 Pa. 81; Keller v. Scranton, 200 Pa. 130; Long v. School Dist., 269 Pa. 472; Collins v. Kephart, 271 Pa. 428.

The act is a special law, granting a special privilege to certain unspecified corporations, associations and individuals, contrary to the prohibition of article III, section 7, of the Constitution: Frost v. Cherry, 122 Pa. 417; Com. v. Reynolds, 137 Pa. 389; Ayars' App., 122 Pa. 266.

The act is invalid as an attempted delegation of legislative power to the Old Age Assistance Commission, without setting a definite standard to which the commission must conform: O'Neil v. Ins. Co., 166 Pa. 72; Jermyn v. Scranton, 186 Pa. 595; McGonnell's License, 209 Pa. 327; Com. v. Puder, 261 Pa. 129.

The granting of old age assistance is made to depend on the arbitrary and unrestrained will of the commission, contrary to the equal protection clause of the Four-

teenth Amendment to the Constitution of the United States: Yick Wo v. Hopkins, 118 U. S. 356.

The right to old age assistance is made to depend upon a classification which is arbitrary and unreasonable, and conflicts with the equal protective clause of the Fourteenth Amendment to the Constitution of the United States: Lochner v. New York, 198 U. S. 45; Missouri, etc., Ry. v. May, 194 U. S. 267; Barbier v. Connolly, 113 U. S. 27; Yick Wo v. Hopkins, 118 U. S. 356; Gulf, etc., R. R. v. Ellis, 165 U. S. 150; Mallinckrodt Chemical Works v. Missouri, 238 U. S. 41; Williams v. Arkansas, 217 U. S. 79; Watson v. Maryland, 218 U. S. 173; Barrett v. Indiana, 229 U. S. 26.

*Charles A. O'Brien,* Amicus Curiæ.—This brief is filed on behalf of appellants as amicus curiæ to prove that the Old Age Assistance Act of May 10, 1923, P. L. 189, can be sustained as a modified poor law.

In determining its constitutionality, a statute must be construed in every possible way to sustain it and every presumption is to be indulged in its favor: Sinking Fund Cases, 99 U. S. 700.

The state making appropriations for charitable or benevolent purposes is exempt from the constitutional prohibition against local or special legislation: Booth & Flinn, Ltd., v. Miller, 237 Pa. 297.

OPINION BY MR. JUSTICE KEPHART, February 2, 1925:

The Old Age Assistance Act of May 10, 1923, P. L. 189, was declared by the court below to be in violation of section 18, article III, of the Constitution. It was also held not to be a poor law, and the state treasurer, auditor general and the commission created by the act were enjoined from paying, or approving for payment, bills incurred thereunder. We are now asked to pass on the correctness of these conclusions.

The act in substance is intended for the relief of persons of old age whose financial circumstances in property

or income are below a fixed sum. The statute mentions certain definite qualifications necessary to obtain the relief, but the amount of the assistance, if any, is to be determined by the commission, which the act creates. Among the qualifications are: minimum age of seventy years; citizenship and prior residence of fifteen years; and, where there is a residence of forty years, five years of it must immediately precede the application. A person otherwise within this class is disqualified if, at the time of the application, he or she is in prison, an insane asylum or a reform institution, or if such person has, for six months or more during the fifteen-year period, deserted his wife or husband or children; a professional tramp within one year of the application is disqualified, or, if the person requesting aid has children or others financially able to support him, he may not receive assistance; also one is debarred from participating in the benefits of the act if his property exceeds $3,000, or, if married, the aggregate value of the property of both husband and wife exceeds $3,000. Where assistance is given to one having property, on death it must be returned by the recipient's estate, with interest at three per cent. The maximum amount to be paid under the act is one dollar per day.

The provision of the Constitution under which the act was declared void reads as follows: "No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association."

It is urged, in connection with our deliberation as to constitutionality, that the legislature, in thus selecting, from the entire membership of the State, such favored ones adjudged to be eligible to receive an old age pension of one dollar per day, unduly assumes parental obligations, and, in doing so, is guilty of excessive regulation of private affairs; the act is, therefore, socialistic.

If the act is not opposed to any constitutional barrier, this reason cannot appeal to us; whatever may be the ultimate result in such cases cannot influence the court. Aside from constitutional restrictions, the legislature is the sole judge of the wisdom, expedience and necessity for expending the state's money, the amount to be expended, and the inauguration of the policy of government under which it is spent: Com. v. Pudor, 261 Pa. 129, 136. The judiciary "cannot run a race of opinions upon points of right, reason and expediency with the lawmaking power": Com. v. Moir, 199 Pa. 534, 542.

No more, on the other hand, may be considered the reasons advanced by the proponents of the bill (if the bill is unconstitutional), who urge that it is a highly beneficial measure, in that society, acting through the government, takes hold of a man who reaches a period of life when his usefulness as an active member of the social fabric is at low ebb,—this latter situation, brought about through a depleted physical condition acquired in industrial and other pursuits, causing a partial loss of earning power. The legislature, they say, manifesting a desire to do good, indicating a love of mankind and an effort to promote happiness on the part of the State, steps in through the proposed law to relieve this distress; such efforts are not only a benefit to the men but to the government as well. From a sociological viewpoint, there may be much force in these suggestions; but if the act is stricken down by the fundamental law it is because these purposes are brought within the specific prohibition of section 18, of article III.

Nor would the opposing thought, equally as important, be considered as a basis on which to form our judgment; that is, that the State is not obliged, either in justice or morals, to perform the duty outlined in the act. We may add, however, that, as industrial evolution has worked a marked change in economic life, bringing about to a large extent the conditions complained of by the proponents of the act, the moral duty rests on

these industrial organizations and other employers of labor to provide the system and means to take. care of old age, and those dependent thereon; this as a primary rule of the present economic period.    Some think the desired end may be accomplished by a law much the same as our Workmen's Compensation Act, so moulded as to embrace the workman's wife, with ultimate consideration through the poor laws for that relatively small percentage of individuals who may not be reached and who are in danger of becoming a charge on the body politic.    It is a well-known fact that the Workmen's Compensation Act, as drawn, omits consideration of a large class of citizens, for illustration, an unfortunate farmer or his help, who happens to. be injured.    In support of the contentions against any state assistance it is urged, the great mass of the people, who have not been directly benefited by the services of the men taken care of by the proposed act, should not be called upon to make good the shortcomings of those who have been enriched through their labors, and that, as for service to the State, it rises no higher than that of every man, woman and child in the State obeying the law.

All these theories must be left untouched by judicial opinion; under our form of government, the legislature alone promulgates the policies of government, and is alone responsible if judgment is not well exercised, socially as well as financially.    Our duty as judges is clearly defined; we cannot interfere with the acts of the legislative branch unless they legislate on subjects expressly forbidden by the Constitution.    The reason is obvious.    "One branch of the government cannot encroach on the domain of another without danger.    The safety of our institutions depends in no small degree on a strict observance of this salutary rule": Sinking Fund Cases, 99 U. S. 700, 718.

In passing on the constitutionality of an act such as the one before us, we do not for a moment question the high purpose that prompted those who are interested

in the class of citizens therein provided for; nor do we wish to be understood as condemning such steps as wrongly directed; we are restricted to the question of the constitutional validity of the statute.

In determining whether an act of assembly is unconstitutional certain rules have been laid down for our guidance. It should not be so held unless it is clearly, strongly and imperatively prohibited. "If the act is within the scope of legislative power, it must stand, and we are bound to make it stand if it will upon any intendment......Nothing but a clear violation of the Constitution,—a clear usurpation of power prohibited,—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void": P. R. R. Co. v. Riblet, 66 Pa. 164, 169. Every presumption should be indulged in its favor, and one who claims an act is unconstitutional must prove his case beyond doubt: Collins v. Lewis, 276 Pa. 435, 438; Sinking Fund Cases, supra; Mugler v. Kansas, 123 U. S. 623, 661.

Words must be understood in their general and popular sense, as the people who voted on the Constitution understood them, and we should not go beyond this meaning unless the language is so ambiguous that we need to ascertain the mischief to be remedied: Keller v. Scranton, 200 Pa. 130, 134; Collins v. State Treasurer, 271 Pa. 428, 434; Long v. Cheltenham Twp. School District, 269 Pa. 472, 475; Sharpless v. Phila., 21 Pa. 147, 162.

Considering section 18 of article III, does the Old Age Assistance Act involve an appropriation for charitable or benevolent purposes? The court below correctly held the words "charitable, educational and benevolent" were intended to include pensions or gratuities of every kind, with the exception, because specifically mentioned, of those given for military service. Pensions or gratuities for military service are in the nature of compensation for a special and highly honored

service to the State, implying the idea of a moral obligation on the part of the government; charity and benevolence are not founded on this consideration. They are sometimes used synonymously (Murphy's Est., 184 Pa. 310, 313), and are comprehensive enough to cover any form of gift made by persons or governments kindly disposed towards their subjects or others without obligation to themselves, a desire to do good to advance man's well-being, a love toward mankind, with a wish to promote prosperity and happiness. Proponents of the statute admit these are the underlying purposes of the act, and that the legislature selected a class of persons to be so benefited as an obligation of society, regardless of their ability to earn a livelihood. No gift of money shall be made for benevolent purposes to any person, in substance says the Constitution, and surely these objects and purposes are within the prohibition.

The Commonwealth contends that a narrower view should be given "benevolence" when coupled with "to any person or community," and argues that the original purpose was (1st) to prevent appropriations on account of border raids and other calamities happening within the limits of the Commonwealth, because of the drain on the treasury; (2d) to stop the notorious corruption practiced in securing the passage of these acts; (3d) to prevent unfair discrimination in dispensing such benevolences and charities as between persons and communities; (4th) finally, the legislature could not investigate the merits of these claims. There is no doubt the section effectually put an end to these things, illustrations of which are submitted, but the language used has a much wider field of action, and there is not a line in the section to circumscribe its meaning. Courts must construe the language of the Constitution literally in the spirit in which it is commonly understood, otherwise prejudice may crop out; and, while the debates of the constitutional convention may be interesting, they can-

not be taken to override the ordinary meaning of the words employed.

Appellant further argues that the phrase, "to any person or community," has a restricted meaning, and it is on these words the Commonwealth chiefly relies to sustain the act.   In effect, appellant would have "person" used in an individual rather than a collective sense,—certainly not broad enough to include the government acting in an administrative capacity, functioning through an agency, to work out governmental policies. Appellant argues that direct appropriations, in terms, are not prohibited to such agency, therefore the act is valid, even though the ultimate object may be to give to persons prohibited from receiving the money thus appropriated.   This contention is not sound; "person" and "community" are not limited to the idea of a single person or place where persons are located; they are used in an inclusive sense, relating to an individual or a group or class of persons, wherever situated, in any part or all of the Commonwealth.   It applies to persons, kind, class and place, without qualification.   The language of the Constitution is an absolute and general prohibition.   Nor does the fact that the appropriation is made to an agency (the intermediate and practical step by which public money is distributed to citizens) aid appellant's case.   The gift is not to the commission, but to the particular persons selected by the legislature to receive it.   The commission cannot use the money; it merely passes it on to the selected class.   It is none the less a gift directly to the individual, even though it pauses for a moment on its way thither in the hands of the agency.   Nor can the act be sustained because the appropriation is to an agency as an arm of the government, working out a governmental policy.   What the Constitution prohibits is the establishment of any such policy which causes an appropriation of state moneys for benevolent purposes to a particular class of its citizens, whether under the guise of an agency, as an arm of

the government through which a system is created, or directly to the individual.  As said by the court below, this proposition "is tantamount to saying the legislature can pass a law to do the thing indirectly which the Constitution prohibits it from doing directly."  If this can be done, the Constitution imposes no restraint on the expenditure of money.  But our present Chief Justice, in Collins v. State Treasurer, supra, 436, 439, 440, answered this when he said, "But that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt......  The pruning knife of the law eliminates all such devices, and lays bare the realities of the situation, with which we must deal......The state's money cannot be permitted to go through the agency of the hospital association......since it falls within the class to which that character of recognition is forbidden by the Constitution."

But, says the Commonwealth, if we give to the words "benevolent" and "to any person or community" the broad meaning as contended for by the appellee, and as given by the court below, we in effect wipe out appropriations to nonsectarian, nondenominational and other institutions or persons, drawing the parallel between the use of state money as provided in this act and that for the maintenance of privately owned hospitals, homes for aged citizens and orphans, the maintenance of large hospitals, treatment of mental and physical defectives, mothers' assistance act, state employees', school teachers' and judicial retirement acts.  We might answer this directly by saying that if the instant act violates the Constitution, our duty is plain, regardless of the consequences to other appropriations.  We can only speak generally of the supposedly parallel appropriations, and indicate in this opinion what appears to us to be the clear line of distinction.  In Collins v. State Treasurer, supra, we held that there could be no appropriations,

direct or indirect, under this article of the Constitution, to denominational or sectarian institutions. But when the framers of the Constitution used this language, "No appropriations shall be made for charitable, educational or benevolent purposes......to any denominational or sectarian institution or corporation," an implied authority was given to appropriate to nonsectarian or nondenominational institutions for such purposes, under the maxim "expressio unius est exclusio alterius." As there is no express prohibition against such appropriation, the legislature is free to expend as it sees fit; and this construction is not weakened by the use of the words "to any person or community."

Counsel also overlooked the fact that there is no direct prohibition against the use of state money to pay for the care and maintenance of indigent, infirm and mentally defective persons, without ability or means to sustain themselves, and other charges of a like nature. They become direct charges on the body politic for its own preservation and protection. As such, in the light of an expense, they stand exactly in the same position as the preservation of law and order. To provide institutions, or to compensate such institutions for the care and maintenance of this class of persons, has for a long time been recognized as a governmental duty, and where institutions are compensated (except as hereinafter noted) for the care of indigent, infirm and mentally defective, including certain physically defective, persons, such appropriations may well be sustained on this theory. The expenditure of money for such purposes is and long has been recognized as a function of government, and the manner of its administration is restricted only by section 18 of article III, as stated by this court in Collins v. State Treasurer, supra, 433: "The intent of these provisions was and therefore still is, to forbid the state from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and educa-

tion; they in effect provide that, to serve charitable, educational or benevolent purposes, the money of the people shall not be put under denominational control or into sectarian hands, for administration or distribution, no matter how worthy the end in view." Appropriations to liquidate these expenses cannot be made, directly or indirectly, through a department or agency, to denominational or sectarian institutions: Collins v. State Treasurer, supra. But, as said before, we do not attempt to pass judgment on any specific appropriation, and are speaking generally with regard to the acts held up as a parallel.

With relation to the retirement acts, to which appellant calls attention, the basis on which these acts are founded is neither charitable nor benevolent; they are founded on faithful, valuable services actually rendered to the Commonwealth over a long period of years, under a system of classification which the legislature has considered reasonable. These appropriations are for delayed compensation for these years of continued service actually given in the performance of public duties in their respective capacities, with the quality of right and obligation in its concept. It is compensation for the hazard of long continued public employment. Furthermore, in the Judicial Retirement Act, those participating in or partaking of its benefits are required to hold themselves in readiness to perform such work as may be assigned to them, and to act in the several capacities stated in the statute when designated so to do by the court to which they were formerly attached. It is a well-known fact that persons receiving the benefits of this act, all of whom were or are of mature age, have not only held themselves open to perform the duties that may be assigned to them, but, since their retirement, have actually performed services to the Commonwealth of the utmost importance, and have continued to do so until within a very few days of their death and those who still live are now performing those services; they

in effect hold a legislatively created office for which they are being compensated.

It is earnestly contended that the Old Age Assistance Act should be sustained as a poor law in that the State thereunder assumes administrative control, substituting, in part for outdoor relief, the method adopted by the act, adding thereto a new and comprehensive definition of aged poor, and inaugurating a uniform system of poor laws in the Commonwealth, in addition to the laws now in force. The poor laws of Pennsylvania were taken from the Elizabethan Law of 1601 (43 Eliz., c. II), and our Act of March 9, 1771 (1 Sm. 338, 8 St. at L. 75) continued in effect until the Act of June 13, 1836, P. L. 541. No material change has been made in these laws except, as contended for by appellant, by the act now under consideration. It is urged that the State may define and classify poor persons; if this be true, it is only so to a limited extent; in either attempt it cannot encroach on the manifest prohibition expressed in the Constitution by section 18 of article III, now under consideration.

As mentioned in another part of this opinion, there are diverse classes of individuals who become charges on society as a seemingly necessary incident of our form of government, and among these are aged, infirm, lame, blind or sick, who are unable to support themselves or who have no means of support, and there are no other persons required by law to support them. Pennsylvania early recognized her obligation to all citizens in this respect, and has faithfully kept it. The question here is not whether the State can take over the care of its poor, and relieve the counties and poor districts through the agency created by the Act of 1923; this act nowhere embraces the subject of prior poor laws; it was not intended to, and, if it did, is wholly ineffective for that purpose.

Poor persons and paupers have been used as synonymous words, although not necessarily meaning the same,

but the thing which for more than two hundred years fixed the charge on the Commonwealth was the fact of inability to support themselves, or without means of support. The Constitution of 1873 recognized this condition as a public liability. Nothing is said therein prohibiting, interfering with or controlling the performance of the duty. But that liability or charge cannot be extended, or a new condition created to be brought within it, which would be in direct conflict with section 18 of article III. When the Constitution was adopted the terms "poor laws" and "poor persons" were well understood. These speak of "poor persons not able to work," or "by reason of age, disease, infirmity or other disability, are unable to work," "the needy, sick and indigent," "without means of support," to which the poor authorities were required to give aid. Except as noted, section 18 of article III did not cover them.

A large majority of our citizens are poor people when the word is compared with the term "rich." We speak of certain working people as poor people, without attributing to them the idea that they are not able to work and support themselves. If we were to say to these same persons, "You are objects of public charity and benevolence," they would not only feel insulted but would be inclined to physically resent the imputation. The term "poor," as used by lawmakers, describes those who are destitute and helpless, unable to support themselves, and without means of support. These are objects of public charity, and in every civilized nation the relief of the poor is a public obligation, justifying taxation to raise funds to liquidate it.

Under the Act of 1923 the fundamental basis of poor laws (indigency or inability to work and without means of support) is swept aside as to certain persons, and for it is substituted an age limit for persons having property less than $3,000, and an income less than $365 a year, residence within the Commonwealth for certain length of time, discretion in the commission for the imperative

mandate to poor directors, and other manifest substitutions.

With knowledge of what our "poor laws and persons" from time immemorial have meant, it will be readily seen the subjects considered under the Old Age Pension Act of 1923 are not within that class, and, though the legislature may define such persons, it cannot invade the prohibition set forth in section 18 of article III of the Constitution, thereby enlarging a class well known to those who adopted the Constitution and who knew of the government's responsibility for their keeping; certainly not by including citizens able to help themselves, who have an estate up to $3,000 and an income of $365 a year. It does not require much imagination to show the contrast between the persons considered by the Act of 1923 and those under the poor laws.

If the legislature may call persons with an income of $365 per year and property of $3,000 paupers, there is no reason why subsequent legislatures could not so define persons with property and income of double, treble or quadruple those figures. In other words, in appropriating money, the minute the historical definition of poor persons is broken through, the act enters the field of forbidden legislation through section 18 of article III, and falls as a poor law.

As said by Mr. Justice BREWER in Griffith v. Osawkee Twp., 14 Kans. 418, 422, 27 Pac. St. Rep. 322, 324, "Cold and harsh as the statement may seem, it is nevertheless true that the obligation of the state to help is limited to those who are unable to help themselves." We agree with what the court below says on this question: "That system provided for poor districts, poor directors and overseers, and for the relief of paupers as a matter of local concern. Those who framed the Constitution understood it, and no word is contained in the Constitution with reference to it. The system was left untouched. If there had been any purpose to change that system, some word indicating that purpose would have

been found in the Constitution......The conclusion is therefore irresistible that a direct appropriation from the state treasury to any person or class of persons cannot be sustained on the theory that it is a discharge of the inherent obligation of the State to take care of its paupers."

Decree affirmed.