## Commonwealth v. Perkins

*David R. Perry,* for Commonwealth.
*Samuel Kagle,* for defendant.

HARGEST, P. J., November 4, 1940.—This case involves the constitutionality of the Pennsylvania Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, 43 PS §751.

The Commonwealth, in its own name and for the use of the Unemployment Compensation Fund, brought suit against defendant, Fred C. Perkins, individually and trading as Perkins Battery Company, for the contributions which the Commonwealth claimed were due under the act. Defendant filed an affidavit of defense raising questions of law and attacking the constitutionality of the act.

### Act of assembly

The statute is patterned after the Federal Social Security Act of 1935, title IX, sec. 901, 49 Stat. at L. 639, 42 U. S. C. §1101.

### Provisions of the statute

The act creates an Unemployment Compensation Board of Review in the Department of Labor and Industry and provides elaborate machinery for referees and advisory councils to carry out the act. It requires the department

to take appropriate steps to attempt to stabilize employment, encourage vocational training, assist in the establishment locally of reserves for public works, and to make studies of unemployment situations. The purpose is to create a system of unemployment compensation in cooperation with the Federal Government. It requires the department to "coöperate to the fullest extent with the Social Security Board" established by act of Congress and "to enter into reciprocal arrangements with other States and the Federal Government for carrying out . . . [this act] and unemployment compensation acts of this and other States or adopted by the Congress of the United States."

The statute sets up an unemployment compensation fund into which contributions of employers are to be paid, and the funds therein are to be deposited in the Unemployment Trust Fund of the United States Government created by the Social Security Act of Congress. The act also creates an administration fund for the administration of the act and provides that the costs of such administration and operation shall be paid out of the administration fund, which fund consists of moneys or property received by the department from the Federal Government.

The act requires employers of eight or more employes, who have worked for the time specified in the act, to make contributions prescribed in the act so that the same may be "no more and no less than the maximum credit allowable under the Social Security Act against such Federal excise tax, which shall be equal to the following percentages of wages. . . ." Then follow percentages varying for different years.

Employers who do not employ eight or more employes are also brought within the act, although not within the Federal system, and the same percentages of their total monthly payrolls are exacted. There is no liability on the part of the State beyond the amounts paid into or earned by the fund. The benefits, in the event of unemployment,

are payable upon prescribed conditions and at prescribed rates.

## *Discussion*

A number of constitutional attacks have been raised in the pleadings, only five of which are pressed and will be considered.

1. That the act violates article III, sec. 18, of the Pennsylvania Constitution, which prohibits appropriations for benevolent purposes to any person or community;

2. That sections 308 and 309 violate section 7 of article III of the Pennsylvania Constitution, prohibiting the passage of any local or special law fixing the rate of interest;

3. That section 307 taxes employers engaged in interstate commerce, in violation of section 8 of article I of the Pennsylvania Constitution and the Tenth Amendment to the Constitution of the United States;

4. That the act violates article IX, sec. 12, of the Pennsylvania Constitution, providing that moneys of the State over and above the necessary reserve shall be used in payment of the debt of the State; and

5. That the statute violates the Tenth Amendment to the Federal Constitution.

In determining the constitutionality of a statute it must be construed in every possible way to sustain it, and every presumption is to be indulged in favor of it: Busser et al. v. Snyder et al., 27 Dauph. 231; Sinking-Fund Cases, 99 U. S. 700, 25 L. Ed. 496; Mugler v. Kansas, 123 U. S. 623, 31 L. Ed. 205; and it will only be declared unconstitutional "when it violates the constitution *clearly, palpably, plainly;* and in such manner as to leave *no doubt* or hesitation on our minds": Sharpless et al. v. Philadelphia, 21 Pa. 147, 164; Railroad Co. v. Riblet, 66 Pa. 164; Commonwealth ex rel. v. Liveright et al., 308 Pa. 35, 56. The burden is upon him who asserts its invalidity: Gottschall v. Campbell, 234 Pa. 347, 363. It is no part of the business of the court to discuss

the wisdom of the legislation, however vicious in principle the court may regard it. Its plain duty is to enforce it if it is not in conflict with the fundamental law: Scowden's Appeal, 96 Pa. 422; Commonwealth v. Moir, 199 Pa. 534; Sharpless et al. v. Philadelphia, supra, p. 164. "It [the court] cannot run a race of opinions upon the points of right, reason, and expediency with the lawmaking power": Commonwealth v. Moir, supra, p. 542. Our duty is to determine whether the act is plainly prohibited by the Constitution itself.

This statute seems to be at the parting of the ways. A generation ago its policy of paternalism would have perhaps been unthinkable as a constitutional exercise of power. At that time it would hardly have been conceivable that the State could take the money of a man in Philadelphia, who happens to employ eight or more persons, put it into a fund to be handled by an agency of the Federal Government until it happened to be needed by some man in Erie who was entirely unknown to the employer in Philadelphia, and who perhaps worked in an entirely different line of work, when it was to be withdrawn and placed in the fund controlled by the State agency created by this act, and distributed to the recipient.

The evolution of constitutional law has made tremendous and rapid advancement in recent years. "The ancient landmarks which our fathers have set" have been obliterated by a liberality of interpretation which would have formerly been thought impossible, and by many is still thought dangerous to American ideals.

In State ex rel. v. Switzler, 143 Mo. 287, 322, 323, 45 S. W. 245, 251, decided in 1898, it is said:

"Paternalism, whether State or Federal, as the derivation of the term implies, is an assumption by the government of a quasi-fatherly relation to the citizen and his family, involving excessive governmental regulation of the private affairs and business methods and interests of the people, upon the theory that the people are incapable of managing their own affairs, and is pernicious in its tendencies. In a word it minimizes the citizen and

maximizes the government. Our Federal and State governments are founded upon a principle wholly antagonistic to such a doctrine."

We have apparently traveled a long way in the path of constitutional jurisprudence since the declaration just quoted. And we must consider this case in the light of the present-day constitutional interpretation.

If we follow the cases of Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, and Beeland Wholesale Co. v. Kaufman (Ala.), 174 So. 516, in which an almost identical statute of Alabama was under attack; the cases of Howes Bros. Co. v. Massachusetts Unemployment Compensation Commission (Mass.), 5 N. E. (2d) 720, Gillum v. Johnson (Cal.), 62 Pac. (2d) 1037, and Tatum v. Wheeless (Miss.), 178 So. 95, in all of which unemployment compensation statutes are involved; and the case of Steward Machine Co. v. Davis, 301 U. S. 548, which sustained the Social Security Act of Congress, we must be led to the conclusion that this act of assembly is constitutional. If, however, we rigidly adhere to the principles declared in the cases of Busser et al. v. Snyder et al., 27 Dauph. 231, 282 Pa. 440, and Commonwealth ex rel. v. Liveright et al., 35 Dauph. 179, 308 Pa. 35, we may be led to a different conclusion.

Lying at the threshold of this discussion is the question of whether this statute is a proper exercise of the police power, and whether the police power thus exercised is paramount to the Constitution.

The legislature has declared in section 3 of the statute:

"Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth . . . and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

The mere legislative declaration as to what is a proper exercise of the police power does not preclude the judicial inquiry into that question.

In Pennsylvania Railroad v. Driscoll et al., 330 Pa. 97, 105, it was held that there can be no "legislative absolutism" as to what steps are necessary to secure safety of railroad employes and protection to the public. To the same effect are the cases of In re Harrisburg Bridge Co., 48 Dauph. 274, Tyson & Bro. v. Banton, 273 U. S. 418, 431, Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 536, and Edelman v. Boardman, 332 Pa. 85, 95.

So while the legislative declaration is entitled to the gravest consideration (Mahon et al. v. Penna. Coal Co.,. 274 Pa. 489), yet the court must determine the question of the police power and the emergency for its exercise.

As said in Commonwealth ex rel. v. Liveright et al., 308 Pa. 35, 77:

"The State has these many years recognized this duty by building or aiding in the maintenance of insane asylums and hospitals for treatment of the mentally and physically deficient poor, and has given other poor relief.

"But when the unemployed, with ability to work, have work offered to them, and they, without good reason, do not work, they are not poor people entitled to support within the poor laws of this Commonwealth."

But it has been held that unemployment is a matter affecting the common weal and therefore of governmental concern. It has been so decided in Carmichael v. Southern Coal Co., 301 U. S. 495, 515, Chamberlin, Inc., v. Andrews, 299 U. S. 515, Howes Bro. Co. v. Massachusetts Compensation Commission (Mass.), 5 N. E. (2d) 720, Gillum v. Johnson, 62 Pac. (2d) 1037, Beeland Wholesale Co. v. Kaufman (Ala.), 174 So. 516, and other cases.

The question now before us is whether this act, extending relief to the unemployed, able to work, without any question of indigency, is a proper exercise of the police power.

In Commonwealth ex rel. v. Liveright et al., supra, 35 Dauph. 179, 191, upon the authority of the cases therein referred to, we used as an argument to sustain the statute then attacked that the police power was paramount. We quoted from White's Appeal, 287 Pa. 259:

"It [the police power] is the chief attribute of a sovereign power, for if in its exercise there is conflict with parts of the Constitution, the police power exercised to promote its major objects, will prevail."

We also quoted from Commonwealth v. Widovich et al., 295 Pa. 311, 318, as follows:

"The police power is the greatest and most powerful attribute of government; on it the very existence of the state depends. . . . If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail."

The Supreme Court, in the Liveright case, however, called attention to the fact that we had perhaps overstated the principle, saying (pp. 80, 81):

"The police power cannot be indiscriminately used as a prop to thrust the Constitution aside. . . . Under any circumstances the police power may not be used to strike down a constitutional prohibition when the legislature could by other means bring the act within the Constitution.

"But, while courts will not hesitate to sustain a proper exercise of the police power under circumstances of extraordinary nature (as for instance where its exercise is necessary for the preservation of government), even though a positive constitutional provision stands in its way, the circumstances which call for such exercise must definitely and clearly appear, and the exercise must be in furtherance of a clearly defined major object of government. These instances are rare; therefore, the power in this respect has been sparingly sustained. Merely because the legislative ordinance has declared that it is enacted in the protection of health, safety, morals, and welfare of the government and its people, does not make it so.

"If it was necessary to resort to the police power to sustain the present act, we would decide against such use. When this act was passed, there was no such situation presented to the legislature as would warrant the exercise of this high prerogative of government."

The Commonwealth in the instant case has again asserted the paramount position of the police power even over constitutional provisions, and cites Commonwealth v. Stofchek, 322 Pa. 513, 519, in which the Supreme Court uses language to support that position, quoting the language above quoted from Commonwealth v. Widovich, supra.

We think, however, that the language of Commonwealth ex rel. v. Liveright et al. must be regarded as laying down the precise relation between an asserted police power and a constitutional provision. Therefore, we hold that there is no such situation as requires the court to sustain this act under the police power if it be found to violate the State or Federal Constitution.

1. Is the statute invalid because it is in violation of section 18 of article III of the Pennsylvania Constitution, which provides: "No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community . . ."

The State has no power to take the property of a citizen except by way of taxes or eminent domain: Beeland Wholesale Co. v. Kaufman (Ala.), 174 So. 516. This statute came before the Supreme Court of Pennsylvania on appeal from the decision of this court: Fidelity-Philadelphia Trust Co. et al. v. Hines (same v. Bashore, 48 Dauph. 59), 337 Pa. 48, 51. No question of constitutionality was therein raised, but it was said:

"Although the act provides in form for a payment of 'contributions', such enforced contributions are in reality excise taxes on the right to employ."

We must, therefore, treat this statute as a taxing statute.

Section 1 of article IX of the Constitution provides that all taxes shall be uniform. There is nowhere in the Pennsylvania Constitution any specific authority given to levy taxes nor any limitation imposed as to the purposes for which taxes may be levied. The taxing power is vested absolutely in the legislature as an attribute of sovereignty, with no other limitation upon its exercise than the Constitutions, State and Federal, and the laws of the United States, and the power to tax is bounded only by the necessity of the State and the will of the people: Kirby v. Shaw, 19 Pa. 258; Sharpless et al. v. Philadelphia, 21 Pa. 147; Clouser et al. v. Reading et al., 270 Pa. 92; Fox's Appeal, 112 Pa. 337; Washington Avenue, 69 Pa. 352.

It necessarily follows, however, that taxes cannot be laid except for some proper governmental purpose, and it also follows that no appropriations may be made by the State for benevolent purposes. The question immediately before us is whether the statute in question makes an appropriation for a benevolent purpose within the meaning of this constitutional provision.

The Commonwealth has at great pains presented an elaborate sociological picture to sustain the constitutionality of this act. As to that, we adopt what was said by Mr. Justice Kephart, in Busser et al. v. Snyder et al., 282 Pa. 440, 447, 448:

"No more, on the other hand, may be considered the reasons advanced by the proponents of the bill (if the bill is unconstitutional), who urge that it is a highly beneficial measure, in that society, acting through the government, takes hold of a man who reaches a period of life when his usefulness as an active member of the social fabric is at low ebb,—this latter situation, brought about through a depleted physical condition acquired in industrial and other pursuits, causing a partial loss of earning power. The legislature, they say, manifesting a desire to do good, indicating a love of mankind and an effort to promote happiness on the part of the State, steps in through the proposed law to relieve this distress; such

efforts are not only a benefit to the men but to the government as well. From a sociological viewpoint, there may be much force in these suggestions; but if the act is stricken down by the fundamental law it is because these purposes are brought within the specific prohibition of section 18, article III."

After discussing some theories of meeting the industrial evolution, the court continues:

"All these theories must be left untouched by judicial opinion; under our form of government, the legislature alone promulgates the policies of government, and is alone responsible if judgment is not well exercised, socially as well as financially. Our duty as judges is clearly defined; we cannot interfere with the acts of the legislative branch unless they legislate on subjects expressly forbidden by the Constitution. . . .

"In passing on the constitutionality of an act such as the one before us, we do not for a moment question the high purpose that prompted those who are interested in the class of citizens therein provided for; nor do we wish to be understood as condemning such steps as wrongly directed; we are restricted to the question of the constitutional validity of the statute."

These further questions are involved:

(a) Whether this statute makes an appropriation within the meaning of the Constitution; and

(b) Whether the tax is laid for a benevolent purpose.

(a) As we understand the word "appropriation", when used in the constitutional or legislative sense, it means a designation of money raised by taxation to be withdrawn from the public treasury for a specifically designated purpose. The money in question raised by taxation under this statute never gets into the State Treasury. It is paid into the unemployment compensation fund created under the act, then paid over to the unemployment trust fund, which is the Federal agency created under the act of Congress. Then, as often as necessary, it is requisitioned from the unemployment trust fund back to the unemployment compensation fund, into what is known as

the compensation account, and thence paid to the recipient. The process does not have the earmarks of an appropriation of public moneys as generally understood.

Whether the moneys are public moneys presents a rather difficult hurdle to clear. On the one hand it might be said with force that a State has no right to raise money by taxation which would not properly be designated public money. It is the sovereign power representing the public which has taxed the money away from the individual. The government has no power to lay the tax unless it be for a governmental purpose, and it might seem to be juggling with terms to say that when it is the exercise of a governmental purpose, raising money by taxation, the money so raised, merely because of the method of its treatment when raised, is not public money. Yet that is precisely the trend of the modern decisions.

In Gillum v. Johnson (Cal.), 62 Pac. (2d) 1037, 1043, the court said:

"It must be conceded that the moneys so contributed under the act are not public moneys in the sense that they are subject to appropriation other than as provided in the act."

To the same effect are the cases of Howes Bro. Co. v. Massachusetts Compensation Commission (Mass.), 5 N. E. (2d) 720, Tatum v. Wheeless (Miss.), 178 So. 95, 102, and Gillum v. Johnson, 62 Pac. (2d) 1037, to which fuller reference is made in discussing the fourth question raised by defendant.

However, Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 515, seems to treat the fund as a State fund. It is there said:

"We need not labor the point that expenditures for the relief of the unemployed, conditioned on unemployment alone, without proof of indigence of the recipients of the benefits, is a permissible use of state funds."

We conclude that the funds are not State funds within the contemplation of section 18 of article III of our Constitution.

(*b*) The ordinary use of the word "benevolence" would indicate that a contribution made to one who is unemployed, without the necessity for any proof of indigence, would be a benevolence. This would seem to be so even though the recipient gets it by way of some governmental process, but in the concurring opinion of Mr. Justice Maxey, in Commonwealth ex rel. v. Liveright et al., 308 Pa. 35, 90, it is said:

"I hold that an appropriation of state money to combat widespread poverty arising from unemployment can no more justly be characterized as 'charity' or 'benevolence' than could an appropriation of state money with which to combat a plague sweeping over Pennsylvania."

In the case just cited, Mr. Justice Kephart, in a very extensive opinion reviewing Busser et al. v. Snyder et al., 282 Pa. 440, and Collins v. Martin et al., 290 Pa. 388, held that the care of the poor "was a fixed governmental duty similar to the enforcement of law and order".

We now hold that unemployment is a governmental concern and it is a matter of discretion as to how the legislature shall deal with it. But in Commonwealth ex rel. v. Liveright et al., supra, it was also said (p. 76) : " 'Whether the charitable work is compulsory or discretionary, the performance is controlled by the Constitution'." After discussing the duty of the State toward its poor, the opinion continues (p. 79) :

"Having twice decided that appropriations to perform obligatory public duties or functions are not charities or benevolences, we again hold that the State, in the performance of its governmental duty to take care of the poor, is not forbidden by Article III, Section 18, either directly to assume this obligation or to permit and aid one of its subsidiaries of government to perform it, or to have it performed by an institution not forbidden by the Constitution."

As long as these channels are kept clear, constitutional inhibitions will not disturb such acts. If appropriations to perform the obligatory duties are not charities or

benevolences, it would seem to be a refinement to hold, where there is a governmental concern with which the legislature has discretionary power, that it would be a benevolence merely because the one is obligatory and the other discretionary.

Adopting the language which we have just quoted, we hold that a statute dealing with unemployment, creating an agency for that purpose, is not forbidden by article III, sec. 18, of the Constitution as an appropriation for a charitable or benevolent purpose.

We might quote at length the extract from Busser v. Snyder, 282 Pa. 440, particularly found on page 453, and parts of the opinion in Commonwealth ex rel. v. Liveright et al., supra, which, if carried to their logical end, might lead to a different conclusion; but we are of opinion that the quotation which we have just made from Commonwealth ex rel. v. Liveright et al. expresses the law as it must be applied to this case in determining its validity under article III, sec. 18, of the Constitution.

2. It is contended that sections 308 and 309 of the statute violate section 7 of article III of the Pennsylvania Constitution, which prohibits the passage of local or special laws fixing the rate of interest.

These two sections require that contributions unpaid on the date when they are due shall bear interest at the rate of one percent per month. It is contended on the authority of the case of Pennsylvania Co. v. Philadelphia, 262 Pa. 439, that this is a special act fixing the rate of interest. In that case the Act of June 1, 1915, P. L. 685, required that the damages for private property taken "by municipal corporations" should bear interest at the rate of six percent per annum "from the date of such taking". It was declared unconstitutional because limited to municipal corporations only.

The statute before us applies to all persons who may be subject to its terms, namely, all employers in the State of Pennsylvania. It could hardly be said that grouping all employers and dealing with them as a class is an

unconstitutional classification. No employers are excluded, and what applies to one applies to all. We conclude that this is a proper classification. Moreover, 12 percent interest is not a strange thing in the legislative history of Pennsylvania. It will serve no useful purpose to trace it to its source, but 12 percent interest has been the penalty for nonpayment of taxes for generations.

It must be assumed that the Legislature of 1874 contained many of those who sat in the Constitutional Convention of 1873, which wrote article III into the fundamental law, and it may be presumed that those legislators understood what was thereby intended. One of the very first statutes passed by them was the Act of April 24, 1874, P. L. 68, "for the taxation of corporations", in which the interest penalty is 12 percent per annum for nonpayment. That penalty has been carried along down through the years by the Acts of June 7, 1879, P. L. 112, June 30, 1885, P. L. 193, June 1, 1889, P. L. 420, and into The Fiscal Code of April 9, 1929, P. L. 343. The 12-percent penalty has been before the court in a multitude of cases, although an investigation has not disclosed that it was ever constitutionally attacked: Commonwealth v. Standard Oil Co., 101 Pa. 119, 150; Commonwealth v. The Western Union Telegraph Co., 2 Dauph. 30; Delaware Division Canal Co. v. Commonwealth, 50 Pa. 399; Commonwealth v. J. B. Lippincott Co., 7 Dauph. 193; Commonwealth v. Provident Life & Trust Co., 6 Dauph. 109; Commonwealth v. Philadelphia, 157 Pa. 558, 577.

It would be an unsettling situation now to declare it unconstitutional.

In Commonwealth v. Gilligan, 195 Pa. 504, 511, the Supreme Court was confronted with a similar situation. It was there said:

"The act has stood on the statute book, without challenge for nearly a quarter of a century, and millions of dollars of school funds have been collected and disbursed under its provisions. While these are not reasons for refusing to declare it void if in contravention of the consti-

tution, yet they are strongly persuasive that the act is not so clearly unconstitutional as it should be shown to be to make it our duty now to set it aside."

In Sugar Notch Borough, 192 Pa. 349, 358, the Supreme Court said of a similar situation:

"In conclusion, it is not inappropriate to direct attention to the fact that the act of 1887 has been in operation for twelve years, has been twice previously before this Court, and has been the ground of action many times before other courts without objection to its constitutionality. It is rather late now to question it."

For these reasons we think there is no merit in this contention.

3. It is contended that section 307 of the act violates the commerce clause of the Federal Constitution.

Section 8 of article I of the Constitution of the United States provides, inter alia:

"That Congress shall have power . . . to regulate Commerce with foreign Nations and among the several States . . . ." The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved to the States respectively or to the people."

It is settled that the State cannot levy a direct tax on gross receipts derived from interstate commerce: Meyer v. Wells, Fargo & Co., 223 U. S. 298; Crew Levick Co. v. Pennsylvania, 245 U. S. 292, 295, 297; Cudahy Packing Co. v. Minnesota, 246 U. S. 450. Neither can the State tax the privilege of engaging in interstate commerce, although it may tax the property within a State so employed: Wells, Fargo & Co. v. Nevada, 248 U. S. 165, 167; East Ohio Gas Co. v. Tax Commission, 283 U. S. 465, 469; Adams Mfg. Co. v. Storen, 304 U. S. 307, 311.

The contention of defendant is that this tax is invalid because the employer is engaged in interstate commerce and it amounts to a tax on the privilege so to engage within the State. There is no factual situation to show that defendant is within that class, but we prefer to put

our decision on the broader ground, assuming that he is.

Defendant largely relies on Southern Pacific Co. v. Gallagher et al., 306 U. S. 167, 180. In that case the court, referring to the case of Ozark Pipe Line Corp. v. Monier, 266 U. S. 555, said:

"This Court pointed out that the corporation had a license to engage exclusively in interstate business. The language just quoted shows that this Court interpreted the transactions in Missouri as merely a part of the interstate commerce and the tax on the franchise an interference therewith because a tax directly upon it. '. . . nothing was done in Missouri except in furtherance of transportation.' It was this conclusion of the Court on the factual situation which brought about the *Ozark* decision. Where there is also intrastate activity, an apportioned state franchise tax on foreign corporations doing an interstate business is upheld. A franchise tax on an exclusively interstate business is a direct burden; proportioned to an intermingled business, it is valid. Since the incidence of the California tax as here interpreted is upon events outside of interstate commerce, the *Ozark* opinion is not applicable. There the Missouri tax was upon activities found wholly interstate."

There is no factual situation in the instant case which justifies the application of any of the principles above referred to.

There is, however, another situation which requires serious consideration. Section 307 of the statute provides:

"No employer required by this act to pay contributions shall be relieved from compliance therewith on the ground that he is engaged in interstate commerce, or that this act does not distinguish between employes engaged in interstate commerce and those engaged in intrastate commerce."

In section 906 of the Social Security Act of August 14, 1935, c. 531, 49 Stat. at L. 620, Congress seems to have made plain that it did not intend to cover the field

of interstate commerce which the State statute attempts to do. That section provides:

"No person required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate commerce, or that the State law does not distinguish between employees engaged in interstate commerce and those engaged in intrastate commerce."

The plain purport of that section seems to be that Congress has intended to meet the specific language quoted from Southern Pacific Co. v. Gallagher et al., supra, and has indicated that it has not intended to cover the field of unemployment compensation as related to interstate commerce, even though there is no apportionment of the tax as to interstate and intrastate business.

It may be argued that Congress cannot, by the ipse dixit contained in section 906, as above quoted, determine that the law as declared in the case of Sligh v. Kirkwood, 237 U. S. 52, shall not apply. However that may be, it is well settled that even in commerce among the States the police power of the State to prescribe regulations within its borders is not taken away until Congress enters and covers the field.

In Sligh v. Kirkwood, 237 U. S. 52, 58, it is said:

"That Congress has the exclusive power to regulate interstate commerce is beyond question, and when that authority is exerted by the State, even in the just exercise of the police power, it may not interfere with the supreme authority of Congress over the subject; while this is true, this court from the beginning has recognized that there may be legitimate action by the State in the matter of local regulation, which the State may take until Congress exercises its authority upon the subject. This subject has been so frequently dealt with in decisions of this court that an extended review of the authorities is unnecessary. See the *Minnesota Rate Cases*, 230 U. S. 352."

By the enactment of the Social Security Act, Congress has not been silent but has affirmatively declared that it

does not intend to cover this field, and by the enactment of the Pennsylvania statute the legislature of Pennsylvania has asserted that it intends to exercise its power until Congress does cover the field. In the case of Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, the power of the State of Alabama to enact an unemployment compensation act, almost identical with the statute of Pennsylvania, has been sustained. The question of the illegality of the Alabama statute under the commerce clause of the Federal Constitution does not seem to be directly passed upon either in the Supreme Court of the United States or in the Alabama court: Beeland Wholesale Co. v. Kaufman (Ala.), 174 So. 516.

In the case of Steward Machine Co. v. Davis, 301 U. S. 548, the Supreme Court of the United States distinctly sustained the power of Congress to enact titles 3 and 9 of the Social Security Act. It is there held, with reference to the Alabama statute (p. 597) :

"Even sovereigns may contract without derogating from their sovereignty. . . . The states are at liberty, upon obtaining the consent of Congress, to make agreements with one another. . . . We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment. Alabama is seeking and obtaining a credit of many millions in favor of her citizens out of the Treasury of the nation. Nowhere in our scheme of government—in the limitations express or implied of our federal constitution—do we find that she is prohibited from assenting to conditions that will assure a fair and just requital for benefits received. But we will not labor the point further. An unreal prohibition directed to an unreal agreement will not vitiate an act of Congress, and cause it to collapse in ruin."

It is true also that the commerce clause of the Constitution is not directly involved in this decision, but in the case of Wisconsin v. Cary Mfg. Co., decided in the Circuit Court of Dane County, October 9, 1937, C. C. H. Wis.,

par. 8088, the court had before it the Unemployment Compensation Act of Wisconsin in which the question was directly raised, and there the court said:

"The defense particularly put forth in the present case as a justification for not making the compensation payments is that the defendant corporation is engaged in interstate commerce, and the state of Wisconsin is seeking unconstitutionally to interfere with that commerce. Reliance is had upon the recent decisions of the United States Supreme Court sustaining the National Labor Relations Act as an appropriate exercise of the power by Congress to regulate commerce between the states. . . .

"Congress has not entered upon the field of unemployment compensation, as it has in labor relations, and the question accordingly of conflict with Federal jurisdiction and clash with the commerce clause of the United States Constitution, is purely academic.

"The only ground upon which the defendant might predicate his position is that which may be contended to flow from the labor relations cases; namely, that Congress has preëmpted the field; hence the state must keep out. But the simple truth is that Congress has not. The Federal Social Security Act . . . is not an unemployment compensation law."

We are therefore of opinion that the Pennsylvania statute does not violate the commerce clause of the Federal Constitution.

4. Defendant contends that section 6 of the Compensation Law, which provides for the retention of surplus funds in the custody of the State Treasurer, to be invested as provided under the Act of 1929, and the retention of surplus funds in the unemployment trust fund by the United States Treasurer, violates section 12 of article IX of the Pennsylvania Constitution. This section provides:

"The moneys of the State, over and above the necessary reserve, shall be used in the payment of the debt of the State, either directly or through the sinking fund, and

the moneys of the sinking fund shall never be invested in or loaned upon the security of anything, except the bonds of the United States or of this State."

The scheme set up by the statute is as follows: Contributions are collected by the State Department of Labor and Industry, through the machinery provided by the act, and deposited in an unemployment compensation fund. From time to time moneys in this fund are paid over to the Treasurer of the United States and deposited by him in an unemployment trust fund created by the Social Security Act of Congress. These sums are credited to the State of Pennsylvania. As often as may be necessary, the Department of Labor and Industry may requisition from the unemployment trust fund such amounts as are necessary to pay compensation under the act. Upon the receipt of such requisitioned funds, the department deposits them in the unemployment compensation fund in a ledger account to be known as the compensation account, and expends such moneys for the payment of compensation. All moneys to the credit of the compensation account are required to be mingled and undivided. The department pays compensation authorized by this act out of the compensation account. There is also created a special fund known as the administration fund, which consists of moneys paid to the department by the United States. The State Treasurer is the custodian of the unemployment compensation fund and the administration fund. The moneys belonging to such funds are deposited by the State Treasurer as the general funds of the Commonwealth are deposited, but no deposit insurance charge is paid out of the compensation fund. The budgetary provisions required by The Administrative Code shall not apply to these funds. If title IX of the Social Security Act is repealed or held unconstitutional, the department then requisitions all moneys from the unemployment trust fund. And the act of Congress provides, section 903, that if the State laws are repealed or invalidated the funds shall be paid over to the respective States.

If these funds are State funds there is some basis for the contention that under the cases of Commonwealth ex rel. v. Liveright, 308 Pa. 35, 67, 68, and Montgomery v. Martin et al., 294 Pa. 25, 43, this statute would violate the constitutional provision above quoted in that the moneys are being applied and kept otherwise than as directed therein.

Unemployment statutes have been enacted in a number of States and have been the subject of judicial review. It seems to be invariably held that the revenue so raised is not money of the State. In Beeland Wholesale Co. v. Kaufman, 174 So. 516, 525, where the attack was made that the act violated the Constitution in that it was an act to raise revenue and had not originated in the House as the Constitution required, the court said:

"But when an act has for its main purpose provision for the general welfare by enacting a scheme within the state's police power, it is not one to raise revenue, though it does so as an incident to such scheme."

In Gillum v. Johnson (Calif.), 62 Pac. (2d.) 1037, 1043, the court said:

"It must be conceded that the moneys so contributed under the act are not public moneys in the sense that they are subject to appropriation other than as provided in the act. . . . The balances therein [in the funds] do not revert to the general fund at the end of the fiscal year and under both the state and federal acts constitute trust funds to be administered by the state commission and subject to its call at all times."

In Howes Bros. Co. v. Massachusetts Unemployment Compensation Commission (Mass.), 5 N. E. (2d.) 720, 728, the court said:

"The contributions under the Unemployment Compensation Law are not a part of the general revenue of the Commonwealth, although paid into the State treasury. They are raised by the Commonwealth for a particular purpose through the exercise of the police power."

In Tatum v. Wheeless (Miss.), 178 So. 95, the court said (p. 102) :

"A sufficient answer to this contention is that the fund here provided for and collected is not a fund for the general purposes of running the state government, or providing for the expense of operating the state government. The fund here created is not to be placed in the state treasury—it is a trust fund to be held and applied for the benefit of a class of employes, in the nature of unemployment insurance, and is authorized by law. In other words, the funds here provided are trust funds, and do not belong to the state in its sovereign capacity . . ."

We adopt the reasoning of these cases and hold that the funds are not State funds, and it therefore follows that the constitutional provision applicable to the investment of State funds does not control.

Defendant has attacked the statute both as to the manner of its operation and the size of the revenue provided under it, but these are legislative questions which, at least under the present state of the record, the court has no power to consider.

5. Defendant finally contends that article VI of the act violates the Tenth Amendment to the Federal Constitution in that it deprives the State from functioning as a sovereign State and that the surrender of the surplus moneys to the Treasury of the United States is, pro tanto, an unconstitutional surrender of sovereignty.

This question is considered at length in the case of Steward Machine Co. v. Davis, 301 U. S. 548, 593 et seq., and decided against the contentions of defendant. It is there said (p. 596) :

"We are told that Alabama in consenting to that deposit renounced the plenitude of power inherent in her statehood.

"The same pervasive misconception is in evidence again. All that the state has done is to say in effect through the enactment of a statute that her agents shall be authorized to deposit the unemployment tax receipts

in the Treasury at Washington. . . . The statute may be repealed. Section 903(a)(6). The consent may be revoked. The deposits may be withdrawn. The moment the state commission gives notice to the depositary that it would like the moneys back, the Treasurer will return them. To find state destruction there is to find it almost anywhere. With nearly as much reason one might say that a state abdicates its functions when it places the state moneys on deposit in a national bank.

"There are very good reasons of fiscal and governmental policy why a State should be willing to make the Secretary of the Treasury the custodian of the fund. . . . The credit of the Treasury is at all times back of the deposit, with the result that the right of withdrawal will be unaffected by the fate of any intermediate investments, just as if a checking account in the usual form had been opened in a bank.

"The inference of abdication thus dissolves in thinnest air when the deposit is conceived of as dependent upon a statutory consent, and not upon a contract effective to create a duty."

The question of coercion of States by the passage of the Federal statute has been considered in the cases of Tatum v. Wheeless (Miss.), 178 So. 95, Gillum v. Johnson (Calif.), 62 Pac. (2d.) 1037, Howes Bros. Co. v. Massachusetts Unemployment Compensation Commission (Mass.), 5 N. E. (2d) 720, and Beeland Wholesale Co. v. Kaufman (Ala.), 174 So. 516. It is held in each case that there is no unconstitutional coercion.

For the reasons herein expressed, we conclude that this statute does not violate the Tenth Amendment to the Federal Constitution.

And now, November 4, 1940, the affidavit of defense and the supplementary affidavit of defense raising questions of law are hereby overruled, and defendant is hereby directed to file an affidavit to the merits within 15 days from this date.